IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FREEDOM FROM RELIGION | : | Civil Action No. 2:12-cv-01406 |
| FOUNDATION, INC., DOE 4, by Doe 4's | : | |
| next of friend and parent Doe 5, who also | : | |
| sues on Doe 5's own behalf, | : | |
| | : | |
| Plaintiffs, | : | |
| vs. | : | |
| | : | |
| CONNELLSVILLE AREA SCHOOL | : | |
| DISTRICT, | : | |
| | : | |
| Defendant. | : | |

**BRIEF IN OPPOSITION TO PLAINTIFFS'
<u>MOTION FOR SUMMARY JUDGMENT</u>**

ANDREWS & PRICE, LLC

By:____/s/ John W. Smart, Esq._____
         John W. Smart, Esq.
         PA I.D. #43592

         /s/ Amie A. Thompson, Esq.
         Amie A. Thompson, Esq.
         P.A. I.D. #309345

         1500 Ardmore Boulevard, Suite 506
         Pittsburgh, PA  15221
         (412) 243-9700

         Attorneys for Defendant Connellsville
         Area School District

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ......................................................................... ii

FACTS ........................................................................................................1

ARGUMENT ..............................................................................................5

A.     THE APPLICABLE ESTABLISHMENT CLAUSE TESTS ...............................5

     i. The Van Orden Exception ................................................7

     ii. Town of Greece v. Galloway .........................................9

     iii. Doe v. Harlan County School District ........................12

B.     APPLICATION OF THE LAW TO THE FACTS IN THIS CASE.................12

     i. A Closer Look Under Greece and the Van Orden Exception.......................12

     ii. The Proper Focus of Establishment Clause Review is on the Government's Use of the Challenged Display, Not on the Words or Actions of Private Parties .................................16

CONCLUSION ...........................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**Page**

<u>CASES</u>

*Card v. City of Everett,*
520 F.3d 1009 (9th Cir. 2008) ........................................................................ *passim*

*Capital Square and Advisory Bd. v. Pinette,*
   515 U.S. 753 (1995) ............................................................................................. 16

*Clever v. Cherry Hill Tp. Bd. of Educ.,*
   838 F. Supp. 929 (D.N.J. 1993) ........................................................................ 8, 9

*County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter,*
   492 U.S. 573 (1989) ............................................................................................... 9

*Doe v. Harlan County School District.,*
   96 F. Supp. 2d 667 (E.D. Ky. 2000) .................................................................. 12

*Doe v. Indian River Sch. Dist.,*
   653 F.3d 256 (3d Cir. 2011) ................................................................... 5, 15, 17

*Edwards v. Aguillard,*
   482 U.S. 578 (1987) ............................................................................................... 6

*Freethought Soc. of Greater Philadelphia v. Chester Cnty.,*
   334 F.3d 247 (3d Cir. 2003) ........................................................................... 6, 16

*Green v. Haskell County Board of Commissioners,*
   568 F.3d 784 (10th Cir. 2009) ....................................................................... 17, 18

*Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.,*
   240 U.S. at 251 (1916) ........................................................................................ 12

*Kitzmiller v. Dover Area School Dist.,*
   400 F. Supp. 2d 707 (M.D. Pa. 2005) ................................................................ 18

*Lee v. Weisman,*
   505 U.S. 577 (1992) ............................................................................................... 5

*Marsh v. Chambers,*
   463 U.S. 783 (1983) ............................................................................................. 10

*McCreary Cnty. v. Am. Civil Liberties Union of Ky.,*
   545 U.S. 844 (2005) ....................................................................................... *passim*

*New Kensington-Arnold Sch. Dist.*,
  919 F.Supp.2d 648 ........................................................................................................ 16

*Stone v. Graham*,
  449 U.S. 39 (1980) ..................................................................................................... 6, 7

*Teague v. Lane*,
  489 U.S. 288 (1989) ...................................................................................................... 12

*Town of Greece v. Galloway*,
  134 S. Ct. 1811 (2014) ........................................................................................... *passim*

*Trunk v. City of San Diego*,
  568 F. Supp. 2d 1199 (S.D. Cal. 2008) ........................................................................ 8

*Van Orden v. Perry*,
  125 S. Ct. 2854 (2005) ........................................................................................... *passim*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FREEDOM FROM RELIGION FOUNDATION, INC., DOE 4, by Doe 4's next of friend and parent Doe 5, who also sues on Doe 5's own behalf, | : : : : | |
| | : | Civil Action No. 2:12-cv-01406 |
| Plaintiffs, | : | |
| vs. | : | |
| | : | |
| CONNELLSVILLE AREA SCHOOL DISTRICT, | : : | JURY TRIAL DEMANDED |
| | : | |
| Defendant. | : : | |

### BRIEF IN OPPOSITION TO PLAINTIFFS'
### MOTION FOR SUMMARY JUDGMENT

Defendant, the Connellsville Area School District, by and through its attorneys, John W. Smart, Esquire, Amie A Thompson, Esquire, and the law firm of Andrews & Price, file the following Brief in Opposition to Plaintiffs' Motion for Summary Judgment averring as follows:

### INTRODUCTION

There are no issues of material fact that preclude summary judgment on the behalf of Defendant Connellsville Area School District ("Defendant" or "School District"). Furthermore, when the law is applied to the undisputed facts, the School District is clearly entitled to a favorable judgment.

### FACTS

Plaintiffs draw attention to various religious aspects of the Eagles' Monument; however, some of these facts are blatantly misleading. For instance, in discussing the dedication of the Monument on June 3, 1957, the Plaintiffs cite to a quote from the "national Eagles

representative."[1] (Doc. 49, Plaintiffs' Brief in Support of Summary Judgment, at p. 4). However, this gentlemen did not speak only of relgion, but of a moral code as well. "Given a firm morality", the newspaper quoted, "peace inside men and strong nations become reality." (Plaintiffs' Exhibit E, Connellsville 00080).

Plaintiffs have described the monument as a large "striking religious symbol". (Doc. 49 at 1; 3). However, time and the elements have worn away much of the text on the Monument, (compare Plaintiffs' Exhibit D, Doc 48-1 at p. 17 and Doc. 48-1 at p. 14), making it less than striking. To some it is unrecognizable. In fact, people in the community had mistaken the monument for a war memorial. (Plaintiffs' Exhibit T, Connellsville 00907).

Plaintiffs contend that "[Superintendent] Lujetic visited the Connellsville Church of God to see if the Monument could be placed on the church's property, 'next to the high school.' CSF ¶ 53." (Doc. 49 at p. 5). However, there are absolutely no facts of record to support this contention. In fact, Plaintiffs' Concise Statement of Material Facts provides, with no citation to anything in support thereof, that Superintendent Lujectic commented about the same "confidentially." (*See* CSF ¶ 53). This speculation, conjecture, and unsupported accusation by an unnamed "confidant" must not be given credence by this Court.

Furthermore, only on advice of counsel, did Superintendent Lujectic make statements to the media regarding the potential success of this litigation. (A189:37). In fairness, Dr. Lujectic was predominately concerned about cost and trying to be fiscally prudent in handling threats of litigation. (A248-249: 96-97). He did not care, personally, whether the Monument stayed or moved. (A249:97). As this Honorable Court, as well as Plaintiffs are aware there is no law

---

[1] "Without a moral code; men fail to be good neighbors and nations do not live at peace with one another. Without a moral code, we are soon lost in personal or notional frustration. But, given a firm morality, peace inside men and among nations can become a reality. Such a code is the Commandments, written with the fingers of God." (Doc. 49 at p. 4).

directly on point here and Establishment Clause case precedent is terribly murky. *See Van Orden v. Perry*, 545 U.S. 677, 694 (2005) (The Supreme Court's Establishment Clause "jurisprudence leaves courts, governments, and believers and nonbelievers alike confused - an observation that is hardly new.").

Plaintiffs further contend that on September 10, 2012, CASD Board President reported to the media that the Church of God would receive the Monument pending CASD Board approval. *See* CSF ¶ 63. What Plaintiffs fail to disclose is the fact that the pastor of the Church of God contacted the CASD Board. (A211:59). No definitive decision was ever made by the CASD Board to move the Monument to the Church of God. (A211:59). Instead, the CASD Board unanimously voted to retain the Monument "until further notice and pending further legal action." (Doc. 48; CSF ¶ 93). Therefore, although the CASD Board was provided an opportunity to give the monument to the Church of God, who wished to receive it, they chose not to do so. The Monument remains covered on school property to this day. (A0368).

Plaintiffs provide that "on a number of occasions" Dr. Lujectic "informed people that the intended relocation of the Monument would make it more prominent and that he might celebrate the relocation with a large community ceremony to dedicate it. CSF ¶¶ 61-62." (Doc. 49 at p. 5). Yet, Dr. Lujectic wrote to only two (2) individuals in e-mail communication that was not public that it was his intention to have the Monument more prominently displayed in the community should the Monument be moved. (Doc 48; CSF ¶¶ 61-62). This was only Dr. Lujectic's personal opinion. (A229:77).

Plaintiffs also attempt to skew facts regarding a rally that occurred prior to the September 12, 2012 public Board of School Directors meeting. (Doc. 49 at pp. 5-6). Plaintiffs appear to concede that the only person affiliated with the school district in attendance was Superintendent

Lujetic. (Doc. 49 at pp. 5-6). As Superintendent, he was present for any rally or meeting on school property to ensure control. (A221:69). There are, however, no facts of record to support that Superintendent Lujectic actively participated in this rally or agreed with its message. In fact, no one even asked for permission to hold a rally at the Monument, as it was "spontaneous." (A220:68, A233-234:81-82).

Plaintiffs contend that the CASD Board was "swayed by the public comment" at the CASD Board meeting. (Doc 49 at p. 6; CSF ¶ 79). However, Superintendent Lujectic testified that he "believe[d] that the board was swayed" by "public comment" and by "public opinion" "in favor of keeping the monument." (A259:107). He clarified, "[e]specially not living in the district and understanding what the public wanted, you know, we are all -- we work for the public." (A260:108). This was in addition to the sentiment that the Freedom From Religion Foundation, a group based in Wisconsin, was trying to tell the Board and Administration how to run the school district. (A0201:2-5; A0248:18-20). No other school board members were deposed. Hence, the Plaintiffs contention was based solely on Dr. Lujectic's beliefs.

Plaintiffs address various times in which vandals uncovered the Monument. (Doc. 49 at p. 7). To be clear, there is absolutely nothing in the record to support that the School District was involved in unveiling the Monument. Nor is there any evidence to suggest that the School District was made aware of comments made by the criminals that partook in this activity. (*See* Doc. 49 at p. 7). Finally, there is not a scintilla of evidence to suggest, and the Plaintiffs do not appear to allege, that the School District was in any way affiliated with the group "Thou Shall Not Move." Most poignantly, almost all of the facts alleged by the Plaintiffs involve activity that occurred after they, the Freedom From Religion Foundation and two anonymous individuals,

4

threatened and then filed a lawsuit against the School District, alleging that the monument offended their choice to not believe in God. (*See* Doc. 49 at pp. 1-8).

## ARGUMENT

### A        THE APPLICABLE ESTABLISHMENT CLAUSE TESTS

The Plaintiffs ask this Court not to "dredge[ ] up the Establishment Clause's murky past," because "the Third Circuit has so recently done its part to provide clarity to the situation." (Doc. 49 at p. 8) (citing *Doe v. Indian River Sch. Dist.*, 653 F.3d 283-289 (3d Cir. 2011)). *Doe v. Indian River School District*, however, does not control the matter presently before this Honorable Court.

In *Indian River*, the Court, after a thorough factual analysis, held that the matter was "controlled by the principles in *Lee v. Weisman* [505 U.S. 577 (1992)]." *Indian River*, 653 F.3d at 282. In *Lee*, a Public school student and her father brought suit seeking a permanent injunction to prevent inclusion of invocations and benedictions in the form of prayer in graduation ceremonies of city public schools. 505 U.S. at 577. Thus, *Indian River* was controlled by a case involving school prayer in an educational setting.

This Honorable Court has already recognized that there are "two branches of the jurisprudence," "one that attempts to govern the use of (potentially) non-secular imagery and text in passive displays (e.g., the Ten Commandments) and another that counsels what is (not) appropriate in an educational setting (e.g., prayer in the public school system)." (A25:9-A26:10). This case does not involve prayer in the public school system; it involves a passive display of an Eagles' Monument bearing the Ten Commandments, as well as other secular symbols, which has stood on school property for nearly five decades without any action taken by either community

members or the School District. Using the same logic espoused by the Plaintiffs, no court has ever found the display of an Eagles Monument on school district property to be violative of the First Amendment.

Plaintiffs also argue that "Establishment Clause cases in the public school setting are different," and continue to rely upon cases that do not involve passive monuments. (Doc 49 at p. 12) (citing e.g., *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987) (constitutionality of Louisiana Balanced Treatment for Creation-Science and Evolution-Science in Public School Instruction Act); *Lee*, 505 U.S. at 577 (prayer *Stone v. Graham*, 449 U.S. 39 (1980) (Ten Commandments posting in classrooms).

Plaintiffs commit the same error in continuing to emphasize the applicability of *Stone v. Graham*, which they argue is the "case most similar to this case." As the Supreme Court explained, "*Stone* did not purport to decide the constitutionality of every possible way the Commandments might be set out by the government, and under the Establishment Clause detail is key." *McCreary Cnty. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 867 (2005) (citation omitted); *see also Freethought Soc. of Greater Philadelphia*, 334 F.3d at 262 ("[W]e do not believe that *Stone* holds that there can never be a secular purpose for posting the Ten Commandments, or that the Ten Commandments are so overwhelmingly religious in nature that they will always be seen only as an endorsement of religion."). Furthermore, the *McCreary* Court clarified that the *Stone* majority did not have occasion "to hold that a sacred text can never be integrated constitutionally into a governmental display on the subject of law, or American history." *McCreary Cnty.*, 545 U.S. at 874. Rather, it only decided that that "purpose needs to be taken seriously under the Establishment Clause and needs to be understood in light of context." *Id.*

Even in *Stone* Justice Rehnquist dissented from the Court's per curiam opinion, arguing against the Court's "cavalier summary reversal, without benefit of oral argument or briefs on the merits, of the highest court of Kentucky." 449 U.S. at 47. He maintained that such a summary rejection of the legislature's stated secular purpose was contrary to the Court's precedent. *Id.* at 43. Justice Rehnquist reasoned that the legislature's action was not unconstitutional simply because "the asserted secular purpose may overlap with what some may see as a religious objective." *Id.* at 44. He argued that "[t]he Establishment Clause does not require that the public sector be insulated from all things which have a religious significance or origin." *Id.* at 45-46.

  **i.**  **The Van Orden Exception**

The Supreme Court has drawn attention to the *Stone* court's reliance upon school prayer cases when it implemented the *Lemon* test to reach its ultimate decision. *See Van Orden v. Perry*, 125 S. Ct. 2854, 2864 (2005). As noted in Defendants' principal brief, the *Lemon* test has not escaped its narrow survival in Establishment Clause jurisprudence without criticism by various members of the Supreme Court. *See McCreary*, 545 U.S. at 890 (Scalia, J., dissenting).

The Ninth Circuit found the most significant distinction between the two Supreme Court opinions that ruled on the constitutionality of the Eagles' Monuments, similar to the one in this matter, was that in *McCreary* the Supreme Court used the *Lemon* test, while it declined to do so *Van Orden*. *See Card v. City of Everett*, 520 F.3d 1009, 1016 (9th Cir. 2008). The Ninth Circuit's "study of the cases" led it to conclude that while *McCreary* reaffirmed that the *Lemon* test "remains the general rule for evaluating whether an Establishment Clause violation exists," the decision in *Van Orden* carved out an exception to Lemon's application for "some

longstanding plainly religious displays that convey a historical or secular message in a non-religious context." *Card*, 520 F.3d at 1016.

To determine whether the *Van Orden* exception should apply in a case, the Ninth Circuit developed a three prong approach based on Justice Breyer's concurring opinion in *Van Orden*. The first prong evaluates the purpose of the religious display, including the "actual purpose" as well as the "perceptions of that purpose by viewers." *Card*, 520 F.3d at 1020 (citing *Van Orden*, 545 U.S. at 702). Under the second prong, the court observes at the location of the monument and decides whether it "suggest[s] little or nothing of the sacred." *Id.* at 1019.

Similar to the inquiry by Justice Breyer, the *Card* Court questioned "whether the display include[s] other elements that suggest a secular message" and whether "the physical setting [of the monument is] conducive to religious activities." *Id.* at 1020. The final prong looks at the longevity of the monument and asks whether there has been an "[h]istoric [l]ack of [c]omplaints" about the religious display over a sufficient number of years. *Id.* at 1021.

At least one district court in the Ninth Circuit has employed this approach to resolve the constitutionality of a religious display on government property. *See Trunk v. City of San Diego*, 568 F. Supp. 2d 1199 (S.D. Cal. 2008) (applying both the *Lemon* test and the Ninth Circuit's *Card* test to determine whether the presence of a Latin cross as part of a veteran's memorial on public property (acquired through eminent domain) violated the Establishment Clause).

Additionally, a federal district court has held, following the *Stone* decision but before the Supreme Court decided *McCreary* and *Van Orden*, that a school district policy requiring classroom posting of calendars marking various national, ethnic, and religious holidays, and allowing seasonal displays of religious images did not violate the Establishment Clause. *Clever v. Cherry Hill Tp. Bd. of Educ.*, 838 F. Supp. 929 (D.N.J. 1993). This court stated that it was

important to evaluate the government's practice "in its own unique circumstances to determine whether it constitutes an endorsement or disapproval of religion." *Id.* at 937. The context is important because "it may determine what viewers fairly understand to be the purpose of the display, and may negate any message of endorsement that the religious symbol might otherwise evoke." *Id.*

### ii.     Town of Greece v. Galloway

The Supreme Court's recent decision in *Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014), further supports the *Van Orden* analysis, emphasizing the importance of history as a guide to interpreting the Establishment Clause. *Greece* makes clear that where a challenged government action fits within a longstanding historical tradition, then the action is consistent with the Establishment Clause as long as it does not coerce or penalize nonadherents. *Greece*, 134 S. Ct. at 1811. A perception of government endorsement of religion, or feeling of exclusion, is insufficient under *Greece* to invalidate a government action that is sanctioned by history and tradition.

*Greece* explicitly held that "the Establishment Clause must be interpreted by reference to historical practices and understandings." *Id.* at 1813. The majority opinion approvingly quoted Justice Kennedy's opinion in *County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 670 (1989) criticizing the endorsement test, and held that the *Allegheny* majority's rebuttal to that argument was flawed. *Id.* at 1820-1821. Although the Supreme Court in *Greece* did not abolish the endorsement test, it made clear that when that test produces results that would sweep away longstanding historical practices and traditions, it is the test, rather than the historical practice, that is inconsistent with the Establishment Clause. *Id.* at 1819; *see also id.* at 1834 (Alito, J., concurring) ("if there is any inconsistency between any of

9

those tests and the historic practice of legislative prayer, the inconsistency calls into question the validity of the test, not the historic practice.")

*Greece* considered the constitutionality of a town council's practice of beginning each meeting with an invocation delivered by a local clergyman. From the time the practice was instituted, in 1999, until around the time a complaint was filed in 2008, all of the prayers were offered by Christian clergymen, and some of them used a "distinctly Christian idiom." *Id.* at 1816. The Court did not address the prayers' constitutionality by inquiring into whether they sent a message of government endorsement of religion, but rather by examining "whether the prayer practice in the town of *Greece* fits within the tradition long followed in Congress and the state legislatures." *Id.* at 1819.

In *Marsh v. Chambers*, 463 U.S. 783 (U.S. 1983), the Court had upheld the Nebraska Legislature's century-old practice of employing a chaplain who opened its legislative sessions with a prayer. *Greece* presented different facts, however; its practice dated back less than a decade before challenge; its sessions were adjudicative as well as legislative; and its rotating "chaplain[s] for the month," 134 S. Ct. at 1816, unlike the chaplain in Nebraska, did not refrain from offering explicitly Christian prayers. Nevertheless, the Court found that Greece's practice found support not only from the broader tradition of legislative prayer acknowledged in *Marsh*, but also because there was some evidence of local governing bodies solemnizing their meetings with prayer. "Although no information has been cited by the parties to indicate how many local legislative bodies open their meetings with prayer, this practice too has historical precedent." *Id.* at 1819 (citing a 1910 report of the proceedings of the City Council of Boston).

The plaintiffs in *Greece* argued that the prayers were unconstitutional because they made them, as nonbelievers, feel "excluded and disrespected," *id.* at 1826, and because "constituents

might feel pressure to join the prayers" to avoid offending the board members from whom they are about to seek a decision. It is here that the Court's departure from the endorsement test is most prominent. The Court explained that the "prayer opportunity in this case must be evaluated against the backdrop of historical practice."

As a practice that has long endured, legislative prayer has become part of our heritage and tradition, part of our expressive idiom, similar to the Pledge of Allegiance, inaugural prayer, or the recitation of 'God save the United States and this honorable Court' at the opening of this Court's sessions. It is presumed that the reasonable observer is acquainted with this tradition and understands that its purposes are to lend gravity to public proceedings and to acknowledge the place religion holds in the lives of many private citizens, not to afford government an opportunity to proselytize or force truant constituents into the pews. *Id.* at 1825. In other words, where a government action involving religion is part of a longstanding tradition, the reasonable observer is presumed to perceive it within that historical context rather than as an establishment of religion.

The Court noted that, if there were actual evidence that the town had discriminated against nonpraying citizens, that would be unconstitutional, but mere unsubstantiated fears of discrimination or feelings of offense or exclusion were not sufficient to show a violation. As the Court explained, "Offense . . . does not equate to coercion." Even, as in *Greece*, when that expression takes place on government property at the government's invitation. *Id.* at 1826.

In light of *Greece's* holding that the interpretation and application of the Establishment Clause must be guided by historical practices and understandings, *id.* at 1819, the evidence demonstrating a historical practice of dedicating Eagles' Monuments for the sole purpose of promoting a moral code, and not for religious purposes, must be observed.

11

### iii.     Doe v. Harlan County School District

The Plaintiffs argue that by denying certiorari in *Doe v. Harlan County School District.*, 96 F. Supp. 2d 667 (E.D. Ky. 2000), and granting certiorari in the companion case *McCreary*, 545 U.S. at 844, the Supreme Court suggested that the Sixth Circuit's analysis of that *Harlan County* was proper. (Doc. 49 at p. 15). However, a denial of a writ of certiorari imports no expression of opinion upon the merits of a case, and thus has no precedential effect. *See, e.g., Teague v. Lane*, 489 U.S. 288 (1989). This is so, because of the variety of considerations that underlie denials of the writ. *Id.* A denial of certiorari is not to be equated with an affirmance of the judgment below. *Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. at 251 (1916).

Furthermore, in two decisions issued the same day in June, 2005, the Supreme Court concluded that the display of the Ten Commandments on the grounds of the Texas state capitol in *Van Orden* were constitutional and held the displays in county courthouses containing the Ten Commandments were unconstitutional in *McCreary County*. Justice Breyer was the only Justice on the "winning side" in both cases. He joined the Court's opinion striking down the display in *McCreary County* and wrote a separate opinion, concurring in the judgment in *Van Orden*, upholding the display. Therefore, context, rather than sheer location, appears to have been of great importance.

### B.     APPLICATION OF THE LAW TO THE FACTS IN THIS CASE

### i.     A Closer Look Under Greece and the Van Orden Exception

A key purpose of the Establishment Clause is to protect nonadherents from the subversive effect of governmental favoritism toward the majority religion. There are no facts of record, whatsoever, to support that the School District favors any religion or religion at all.

The circumstances surrounding the erection of the Eagles' Monument on School District property clearly suggests that the School District intended the nonreligious aspects of the display to predominate. The monument's 55-year history, without a complaint, indicate that that has been its effect.

As the U.S. Supreme Court so poignantly provided in its evaluation an Eagles' Monument in *Van Orden*, "[t]he group that donated the monument, the Fraternal Order of Eagles, a private civic (and primarily secular) organization, while interested in the religious aspect of the Ten Commandments, sought to highlight the Commandments' role in shaping civic morality as part of that organization's efforts to combat juvenile delinquency." 545 U.S. at 701. "The Eagles' consultation with a committee composed of members of several faiths in order to find a nonsectarian text underscores the group's ethics-based motives." *Id.* "The tablets, as displayed on the monument, prominently acknowledge that the Eagles donated the display, a factor which, though not sufficient, thereby further distances the [School District] itself from the religious aspect of the Commandments' message." *Id.*

Hence, the "actual purpose" of accepting the Eagles' Monument, as well as the "perceptions of that purpose by viewers", is secular. *See Card*, 520 F.3d at 1020 (citing *Van Orden*, 545 U.S. at 702). As the 1954 Grand Aerie Convention minutes reflect, the Youth Guidance Committee of the Fraternal Order of the Eagles determined that "there existed a problem across the country concerning juvenile delinquency and juvenile crime." (A0295). The Eagles "sought to remedy this situation through a social awareness campaign." *Id.* The Eagles chose to highlight the Ten Commandments "as the foundation of law in our culture" which could easily serve as a "nice short-hand of rules to govern personal conduct." *Id.* "The goal of the ten commandments' project was to acknowledge the ten commandments historical

impact on the development of Western legal tradition and, through reminding the public of this historical fact, inspiring the youth to live law abiding and productive lives." *Id.* The project was not spearheaded by religious leaders, a religious organization, or anyone who had a religious motivation. The impetus of the project was Judge Ruegemer, who served on a Juvenile Court bench and was chairman of the Eagles' Youth Guidance Committee.

The committee formed by the Judge to get his project off the ground consisted of fellow judges, lawyers, various city officials, and clergy of several faiths. (A0279). Rather than being motivated by religion, Judge Ruegemer believed that if "youths were exposed to one of mankinds' earliest and long-lasting codes of conduct, those youths might be less inclined to break the law." (A0279).

Under the rationale in *Greece*, there has certainly been a heritage and tradition of using the Ten Commandments as a reflection of laws, rather than for religious purpose. We need not look far into Establishment Clause jurisprudence to find recognition of the same. In *Van Orden*, Chief Justice Rehnquist wrote extensively about our Nation's tradition of using the Ten Commandments this way:

> [A]cknowledgments of the role played by the Ten Commandments in our Nation's heritage are common throughout AmericA We need only look within our own Courtroom. Since 1935, Moses has stood, holding two tablets that reveal portions of the Ten Commandments written in Hebrew, among other lawgivers in the south frieze. Representations of the Ten Commandments adorn the metal gates lining the north and south sides of the Courtroom as well as the doors leading into the Courtroom. Moses also sits on the exterior east facade of the building holding the Ten Commandments tablets.
>
> Similar acknowledgments can be seen throughout a visitor's tour of our Nation's Capital. For example, a large statue of Moses holding the Ten Commandments, alongside a statue of the Apostle Paul, has overlooked the rotunda of the Library of Congress' Jefferson Building since 1897. And the Jefferson Building's Great Reading Room contains a sculpture of a woman beside the Ten Commandments with a quote above her from the Old Testament (Micah 6:8). A medallion with two tablets depicting the Ten Commandments decorates the floor of the National

14

Archives. Inside the Department of Justice, a statue entitled "The Spirit of Law" has two tablets representing the Ten Commandments lying at its feet. In front of the Ronald Reagan Building is another sculpture that includes a depiction of the Ten Commandments. So too a 24-foot-tall sculpture, depicting, among other things, the Ten Commandments and a cross, stands outside the federal courthouse that houses both the Court of Appeals and the District Court for the District of ColumbiA Moses is also prominently featured in the Chamber of the United States House of Representatives.

545 U.S. at 689.

It is clear that from the beginning of the Eagles' Monument project, there was never a desire to persuade youth to ascribe to a religion, and certainly not any one particular religion. There was simply a desire to provide youths guidance on the belief that the Ten Commandments were the foundation for modern law. Whether this belief was correct has been a mode of contention in the past, but that should be given little weight. Even all of the founders of the project proceeded under a mistaken belief, this would not equate to religious motivations.

The perception of this neutral purpose by viewers of the Monument is evidenced predominately by time. In *Card*, the court evaluated this under the *Van Orden* Exception criteria, regarding an "[h]istoric [l]ack of [c]omplaints" about the display over a sufficient number of years. *Card*, 520 F.3d at 1021. Certainly nearly 55 years without any complaint by the community speaks volumes as to the perception of the Monument's neutral purpose, even by the impressionable children that Plaintiffs discuss in their brief.

The location of the Monument, moreover, suggests nothing religious or sacred. *See id.* at 1019. The setting does not lend itself to meditation or any other religious activity, unless running laps nearby counts as religious activity. Along with the Eagles' Monuments inscription about its origin, it simply conveys a message of ethics and morality. The context suggests that the School District intended only these messages. *See id.*

15

Finally, as Plaintiffs concede, the reasonable observer is deemed to be "more knowledgeable than the uninformed passerby." *See* (Doc. 49 at p. 20) (citing *Freethought Soc. of Greater Philadelphia*, 334 F.3d at 259). Plaintiffs specifically state that "If the text [on the Monument] serves any purpose at all, it is to endorse the message and viewpoint of the Eagles . . . ." *See* (Doc. 49 at p. 25). Although they place a slant on the Eagles' message, there can be no more genuine a message than that of the creators of the Monument project as discussed above. This message was clear – this is not a religious monument.

### ii. The Proper Focus of Establishment Clause Review is on the Government's Use of the Challenged Display, Not on the Words or Actions of Private Parties Aafter This Lawsuit was Initiated

While advocating for protections of the First Amendment, the Plaintiffs would like this Honorable Court to impute the comments of community members at two public school board meetings to the School District. If ever there were to be a chilling effect on free speech, this would be it. Certainly, the School District cannot be held liable for violations of the Establishment Clause based on the actions of unaffiliated community members, vandals, and unknown individuals vocalized unsolicited comments and chose to start a social media campaign after the filing of this lawsuit.

The cases relied on by the Plaintiffs to support their position are distinguishable from the case *sub judice*. The most blatant distinction lies in the timing of the public comments. Where such comments were a part of the history of a government practice, policy, etcetera; the Court used this information to determine how a reasonable person, aware of the history and context, would view the practice. Plaintiffs appear to understand this application of the law by initially citing *Capitol Square and Advisory Bd. v. Pinette*, 515 U.S. 753, 780 (1995)

16

(O'Connor, J. concurring) (stating that the reasonable observer is "aware of the history and context of the community and forum in which the religious display appears.").

Nevertheless, what Plaintiffs propose here is not the use of history regarding the Eagles' Monument, but rather the use of public reaction following the filing of this lawsuit. At the time the lawsuit was filed this was not history, this was the future. The lawsuit itself changed perceptions in the community, as did media attention, which was instigated by the Plaintiffs themselves.

In *Indian River*, prayer was the subject of an ongoing and contentious debate that drew spectators to school board meetings. 653 F.3d at 256. The Indian River School Board adopted the prayer policy following religious based public support for its institution. *Id.* The Court held that, "[t]his history is illuminating. This sequence of events shows that the Board's Prayer Policy is closely linked to the desire to maintain prayer at Indian River school events, including at graduations. After all, it was in response to this community uproar that the Board was compelled to draft a formal Prayer Policy." *Id.* at 287.

The religious based public comment in this matter only arose *after* the filing of this lawsuit by the Does and the "Freedom *From* Religion Foundation." This was not part of the history of the Eagles' Monument, as it sat on school property without any attention for nearly 55 years.

In *Green v. Haskell County Board of Commissioners*, 568 F.3d 784, 800 (10th Cir. 2009), the Court provided that "[R]easonable observers have reasonable memories" and are aware of "the context in which the policy arose." The court determined that a reasonable observer would be aware of the religious motivation for seeking the erection of a monument in

that case, as well as board's knowledge of the same, and eventual approval of the monuments erection despite that knowledge. *Green*, 568 F.3d at 800.

There are absolutely no facts of record that are similar to *Green* in this case. There is nothing to suggest that the School District had a religious motivation for accepting the Eagles' Monument, or knew of any religious motivation when it voted to accept the monument. Finally, what is most distinguishable is the lack of comments by School Board members akin to those made in *Green*. 568 F.3d at 802 ("the commissioners left the impression that a principal or primary reason for the erection and maintenance of the display was religious. . . . [O]ne commissioner's statement that 'God died for me and you, and I'm going to stand up for him' appeared in close proximity to the statement 'I won't say that we won't take it down, but it will be after the fight')".).

The community outcry in *Kitzmiller v. Dover Area School Dist.*, 400 F. Supp. 2d 707, 734 (M.D. PA 2005) involved letters to the Editor. These letters were sent during the period from June 1, 2004 through September 1, 2005, which includes the time period from the first Board meetings in which the proposal to change the biology curriculum was announced through the approximate starting date of the trial in this case. *Kitzmiller*, 400 F. Supp. 2d. at 734.

The action taken by the government in *Kitzmiller* was complained of in the letters to the editor prior to the initiation of litigation. Whereas, here, the only time the School District began to receive any attention regarding the Eagles' Monument was after the Plaintiff "Freedom from Religion Foundation," a group whose name pushes for a community "free from religion," filed this lawsuit. Certainly, this Honorable Court cannot ignore the spark of religious fervor that the "Freedom from Religion Foundation" lit in the community amongst those members of the community that ascribe to a particular religion, and wish not to be freed from it. At some point,

the focus moved away from the Monument, and moved onto what was perceived as an attack on religion through litigation.

## **CONCLUSION**[2]

Defendant, the Connellsville Area School District, requests that this Court dismiss Plaintiffs case. The facts of this case are largely not in dispute, and the law as applied to those facts compels this Court to Order dismissal of Plaintiffs' sole cause of action.


Respectfully submitted,

ANDREWS & PRICE

By: /s/ John W. Smart
   John W. Smart, Esquire
   PA I.D. #43592
   /s/ Amie A Thompson
   Amie A Thompson, Esquire
   PA I.D. #309345
   Firm #549
   1500 Ardmore Boulevard
   Suite 506
   Pittsburgh, PA  15221
   (412) 243-9700

   Attorneys for the Defendant

---

[2] The legal issues involved in this case are similar to another matter before this Court involving the display of a similar monument in the New Kensington-Arnold School District. *See FFRF, Inc. v. New Kensington-Arnold Sch. Dist.*, 919 F.Supp.2d 648, 2:12-CV-1319, 2013 WL 228331 (W.D. PA Jan. 22, 2013). Wherefore, Defendant incorporates by reference the legal arguments raised by the New-Kensington Arnold School District, to the extent they do not conflict with those raised herein.