## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **FREEDOM FROM RELIGION FOUNDATION, INC., DOE 4,** *by Doe 4's next friend and parent,* **DOE 5,** *who also sues on Doe 5's own behalf,* )<br>)<br>)<br>) | **2:12-cv-1406** |
| **Plaintiffs,** )<br>) | |
| **vs.** )<br>) | |
| **CONNELLSVILLE AREA SCHOOL DISTRICT,** )<br>)<br>) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION

This case involves a large, granite monument bearing the text of the Ten Commandments on the grounds of a junior high school in the Connellsville Area School District. Freedom from Religion Foundation, Inc. ("FFRF"), Doe 4, by Doe 4's next of friend and parent, Doe 5, who also sues on Doe 5's own behalf ("Plaintiffs"), have challenged the existence of the monument on public school grounds under the Establishment Clause of the First Amendment to the United States Constitution. The parties have filed cross-motions for summary judgment. ECF Nos. 37, 47. The motions have been fully briefed, and the factual record has been thoroughly developed via the parties' concise statements of material fact ("CSMF"), their respective responses, and the attached appendices. ECF Nos. 38-46, 48-49, 52-57. Accordingly, the cross-motions are ripe for disposition.

## I.     Background

### *The Monument*

The monument was donated to the Connellsville Joint School System, now the Connellsville Area School District, in 1956 by Connellsville Aerie No. 493, the local chapter of

the Fraternal Order of Eagles.[1] The monument is 54 inches tall, 32 inches wide, and eight inches thick and weighs about 3,000 pounds. It sits alone in a grassy area near the entrance to the auditorium of Connellsville Area Junior High School, which houses seventh and eighth grades,[2] facing a sidewalk that runs adjacent to a parking lot/street area where school buses line up to drop off and pick up students. Fourteen feet separate the monument from the sidewalk, and 22 feet separate the monument from the parking lot/street area. There is a fire hydrant located several feet to the left and slightly in front of the monument, a tree several feet behind the monument, a "DO NOT ENTER" sign several feet to the right and slightly in front of the monument, and there is some shrubbery several feet to the right of the monument. There are not, however, any other monuments or displays of any sort in the vicinity.[3] The text of the monument, which is visible from the sidewalk, reads:

The Ten Commandments
I AM the LORD thy God.

|     |     |
| --- | --- |
| I. | Thou shalt have no other gods before me. |
| II. | Thou shalt not take the Name of the Lord thy God in vain. |
| III. | Remember the Sabbath Day, to keep it holy. |
| IV. | Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee. |
| V. | Thou shalt not kill. |
| VI. | Thou shalt not commit adultery. |
| VII. | Thou shalt not steal. |

---

1. "The Fraternal Order of Eagles is an international non-profit organization uniting fraternally in the spirit of liberty, truth, justice, and equality, to make human life more desirable by lessening its ills and promoting peace, prosperity, gladness and hope." *Who We Are*, http://www.foe.com/About.aspx (last visited Aug. 18, 2015).

2. The building where the monument is located formerly served as the School District's high school. When the monument was erected, it faced what was then the student parking lot. The building where the monument is located later became one of two junior high schools in the District, known as Connellsville Junior High School East. The two junior high schools (East and West) have since been consolidated in the building where the monument is located. Nevertheless, the parties have continued to refer to the building as "Junior High East." The Court will do so, as well.

3. See the Appendix for photographs of the monument and its surroundings.

VIII.   Thou shalt not bear false witness against thy neighbor.
IX.    Thou shalt not covet thy neighbor's house.
X.     Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's.

At the top of the monument, there are two tablets inscribed with unintelligible ancient script surrounded by a floral motif. An all-seeing eye, like that on the one dollar bill, sits between the two tablets, and an eagle grasping an American flag is immediately below the all-seeing eye. Below the text are the superimposed Greek letters Chi and Rho, which represent Christ, and two Stars of David, which are symbols of the Jewish faith. At the bottom of the monument, there is an inscription indicating that the monument was donated to the School District by the Eagles.

The Joint School Committee of the Connellsville Joint School System voted to accept the monument from the Eagles at its September 11, 1956, meeting. A dedication for the monument was held on June 3, 1957. A contemporaneous article in the *Connellsville Daily Courier* reported that James A. Pujia, state president of the Eagles, presided over the ceremony. George A. Strine, a representative of the Grand Aerie of the Eagles, presented the monument to Robert A. Beard, president of the Connellsville Joint School Committee. Reverend R. A. Nelson, pastor of the Albright Evangelical United Brethren Church in South Connellsville, delivered an invocation and benediction. Several civic leaders and school officials, including Connellsville Mayor Abe I. Daniels, were also on hand.

In his presentation, Strine called "the Commandments 'the golden yardstick of human behaviour [sic].'" He elaborated:

> Without a moral code; men fail to be good neighbors and nations do not live at peace with one another. Without a moral code, we are soon lost in personal or national frustration. But, given a firm morality, peace inside men and among nations becomes a reality. Such a code is the Commandments, written with the fingers of God. Men have enacted millions of laws in an effort to live together as neighbors and nations, but all those man-made laws together have not added to, or subtracted from, or improved upon the simple truth of the Commandments

themselves.

Mayor Daniels echoed those sentiments in his welcoming remarks, "declar[ing] that current social conditions demand serious application of the Ten Commandments in daily life." Pujia added that "[t]here can be no better guidance for youth than God's laws." Guy D. Tressler, Jr., president of the local aerie, was quoted as saying that "the monolith [was] to 'inspire all who pause to view the Ten Commandments with a renewed respect for the law of God which is our greatest strength against the forces that threaten our way of life.'" Following the presentation, "students filed past the monolith."

The monument is one of over a hundred donated throughout the country by the Eagles in the 1950s and 1960s. Minnesota Judge E.J. Ruegemer, the head of the Eagles' Youth Guidance Committee, hatched the plan to donate the monuments in the early 1950s.[4] After serving as a juvenile court judge, Judge Ruegemer came to believe that "troubled youths" might benefit from

---

[4]     The School District has submitted declarations from Judge Ruegemer that were originally submitted to the district courts in *Books v. City of Elkhart*, 235 F.3d 292 (7th Cir. 2000) and *Card v. City of Everett*, 520 F.3d 1009 (9th Cir. 2008). Plaintiffs object that these declarations are irrelevant and, in any event, inadmissible hearsay. The Court disagrees that they are irrelevant. They contain valuable background information about the monument's origin. Whether they contain information that would be admissible at trial is another question, though. Fed. R. Civ. P. 56 does not outright prohibit "[declarations] . . . prepared in connection with another case" from being "used to support a motion for summary judgment." *Roberson v. Bates*, No. CIVS040772DFLKJMP, 2006 WL 1629076, at *3 (E.D. Cal. June 9, 2006). Still, the proponent of the declaration must show that the declarant would be competent to testify at trial on the matters contained in the declaration. No such showing is possible here because Judge Ruegemer is apparently deceased. *See Van Orden v. Perry*, 545 U.S. 677, 713 (Stevens, J., dissenting) (referring to "the *late* Judge E.J. Ruegemer") (emphasis added). "The contents of an affidavit executed by a declarant who has since died is hearsay." *Blackburn v. Northrup Grumman Newport News*, No. 05-02895, 2011 WL 6016092, at *1 n.1 (E.D. Pa. Aug. 31, 2011). The burden thus falls on the School District, as the proponent of the declarations, to establish that they come within an exception to the rule against hearsay. The School District has not made an attempt to do so. Be that as it may, the Court will take this history into account, as it provides important context. Courts in other cases where independent evidence of the Eagles' project was not submitted have done the same. *See, e.g.*, *Van Orden*, 545 U.S. at 713 n.11 (Stevens, J., dissenting); *Adland v. Russ*, 307 F.3d 471, 475 n.1 (6th Cir. 2002).

exposure to the Commandments, which he called "one of mankind's earliest and long-lasting codes of conduct." The Commandments, in his view, would provide these youths with a "common code of conduct." He claimed that it was "never [his] intention that this was to be religious instruction of any kind." To effectuate his plan, he decided to post printed copies of the Commandments in juvenile courtrooms across the country and looked to the Eagles for financial support. The Eagles were initially reluctant to fund the program because they felt it might be viewed as divisive and sectarian. However, after Judge Ruegemer and others decided on a version of the Ten Commandments that they viewed as "non-sectarian," or not identified with any particular religion or religious denomination, the Eagles agreed to lend their support.[5] While the plan was developing, Cecil B. Demille, producer of *The Ten Commandments* movie, contacted Judge Ruegemer to praise the idea, but he suggested that it could be improved by placing the text of the Commandments on bronze plaques. With that in mind, Judge Ruememer eventually decided to post the Commandments on granite monuments instead of paper. In total,

---

5.     As Plaintiffs point out and as Justice Stevens previously observed in his dissent in *Van Orden*, "Despite the Eagles' efforts, not all of the monuments they donated in fact conform to the 'universally-accepted' text." 545 U.S. at 717 n.15 (Stevens, J., dissenting). The monument in this case is one of them. Unlike the version of the Commandments described in the declarations, this one is numbered. It also omits the command, "Thou shalt not make to thyself any graven images." An identical monument was at issue in *State v. Freedom From Religion Foundation, Inc.*, 898 P.2d 1013, 1016 (Colo. 1995). But the monuments involved in other cases were not numbered and included the command against idolatry. *See, e.g.*, *Card v. City of Everett*, 520 F.3d 1009, 1011 (7th Cir. 2008); *Van Orden*, 545 U.S. at 717 n.15; *Adland v. Russ*, 307 F.3d 471, 475 (6th Cir. 2002); *Books v. City of Elkhart*, 235 F.3d 292, 296 (7th Cir. 2000); *Anderson v. Salt Lake City Corp.*, 348 F. Supp. 1170, 1171 (D. Utah 1972). "The distinction represents a critical divide between the Protestant and Catholic faiths" since, during the Reformation, Protestants destroyed images of Jesus Christ and the Virgin Mary that were displayed in Catholic churches. *Van Orden*, 545 U.S. at 717 n.15 (Stevens, J., dissenting). Churches still differ in their use of religious imagery, which "may in part be attributable to differing understandings of the meaning of what is the Second Commandment in the King James Bible translation and a portion of the First Commandment in the Catholic translation." *Id.* (citing Paul Finkelman, *The Ten Commandments on the Courthouse Lawn and Elsewhere*, 73 FORD. L. REV. 1477, 1493-94 (2005)).

the Eagles donated about 140 to 150 monuments to communities throughout the country. "The total number of monuments donated by aeries across the country is higher, however, because some aeries commissioned locally constructed versions modeled after those produced in Minnesota." *Card v. Everett*, 520 F.3d 1009, 1013 (9th Cir. 2008). A number of these have been the subject of litigation.

### Plaintiffs' Contact with the Monument

Doe 4 was a seventh-grade student at Junior High East when this lawsuit was filed in September 2012. She encountered the monument on several occasions while she was outside for gym class. She also observed the monument during a fire drill. Seeing the monument "[k]ind of" bothered her "[b]ecause [she is] not religious." In addition, she testified, "I know other people who aren't religious or just simply don't have that religion. It just bothers me that they're like encouraging the Ten Commandments."

Doe 5 is Doe 4's mother. She is an atheist and member of FFRF, which is a national non-profit corporation dedicated to promoting the separation of church and state and educating the public on non-theism. She has lived in Connellsville her whole life. Although she might have been aware of the monument whenever she was a student in the School District, "[i]t was most definitely on [her] radar when [her] son began attending . . . Junior High East in 2007." She worked as a substitute teacher at Junior High East from 2008 to 2010. Once Doe 4 began attending Junior High East in 2011, Doe 5 visited the school on numerous occasions to meet with administrators and guidance counselors and to drop Doe 4 off at the school. She typically parked her car in the parking lot in front of the main entrance to the building, from which point she could see the monument. She believes that the monument's presence on school property "violates separation of church and state" and "helps to establish the endorsement of a religion . . .

." While she concedes that "some of the Commandments have some ethical value," she also "believe[s] several of the Commandments themselves promote Christianity." Nevertheless, she did not voice concerns about the monument's presence until 2012, when she left a voicemail for an unidentified building and grounds employee about the monument. Thereafter, she made contact with the FFRF, in an attempt to have the monument removed.

### Complaints Arise and the School District Responds

The monument went without legal challenge for 55 years. That changed in August 2012, when the group Americans United for Separation of Church and State sent a letter to School District Superintendent Dr. Daniel C. Lujetic demanding that the monument be removed. After receiving the letter, Lujetic consulted with the School District's solicitor, Christopher Stern, who advised him that the monument would probably not withstand a constitutional challenge. On August 29, 2012, counsel for Plaintiffs sent a letter to the School District, threatening to file suit regarding the monument if the School District did not agree to remove it by September 7, 2012. The School District, fearing the potential costs of litigation, decided to comply with the request. To that end, the monument was initially covered with plastic, but after trespassers removed the plastic, it was covered with a plywood box. Meanwhile, arrangements were being made to relocate the monument to a church next door to the Connellsville Area Senior High School. Dr. Lujetic suggested in an e-mail to a concerned member of the community that relocating the monument could make it "even more prominent." The pastor of the church said that the church had plans to bring more attention to the monument by putting lights on it and possibly surrounding it with park benches.

Word that the monument would be removed was quickly picked up by the news media. That triggered an outpouring of support from the public in favor of keeping the monument.

Superintendent Lujetic received a flood of e-mails regarding the monument, and some community members took to social media to urge the School District to fight.

The School Board was scheduled to discuss the monument at its committee meeting on September 10, 2012. Prior to the meeting, a handful of local pastors, led by Reverend Ewing Marietta, held a prayer rally at the monument, with about 50 people in attendance. More than 100 people attended the Board meeting that followed. The School Board heard two hours of public comment, all of which was in favor of keeping the monument. One Connellsville resident was quoted as saying that the "issue ha[d] 'brought the silent majority out of silence.'" Another asked, "What greater legacy could you leave for the kids than people who stood up and fought the minority and won?" Another speaker who urged the Board to keep the monument commented, "The Lord said if we're not willing to acknowledge Him before man, then why should He acknowledge us before His heavenly father. The Lord Himself might as well be up there asking us to acknowledge Him before the community."

Following the meeting, Board President Jon Detwiler told the media that hearing the public's comments caused him to have a change of heart about fighting to preserve the monument. He added that he believed it should be maintained because of its "historical significance." According to Dr. Lujetic, the "groundswell of public opinion" at the meeting led other Board members to change their minds, as well. He, too, was beginning to come around. From a personal standpoint, "having been deluged with e-mail and phone calls" in support of the monument, Lujetic came to believe that the School District "had a right to stand up for running the district the way we wanted to as opposed to somebody from another state coming in [and telling us how to run it]."

A vote on whether to retain the monument was slated for the Board's next regularly

scheduled meeting, on September 12, 2012. Some 250 members of the community attended the meeting, which was preceded by another, less organized public gathering at the monument. During the Pledge of Allegiance at the start of the meeting, some in attendance noticeably emphasized the word "God." During the public comment portion of the meeting, a number of community members again spoke in favor of retaining the monument. Some of the comments drew shouts of "Amen" from the crowd.

Reverend Marietta, who organized the prayer rally, was the first speaker. He discussed the monument's origins and also remarked that the Ten Commandments have both a religious and secular meaning, as the foundation of the laws of the United States.

A different speaker urged the Board to keep the monument because the Supreme Court had upheld a similar monument in a 2005 case, *Van Orden v. Perry*. He also mentioned that "all of us here are here because we believe in God and Jesus Christ. We have all probably been brought up to believe we are His humble and obedient servants, but we are sinners."

Another speaker commented, "God has blessed our country . . . because we are founded upon God and his word." She continued, "The Bible was a textbook in all the early schools. Harvard, Yale, Princeton were all founded upon the word of God. But in 1963, our Supreme Court yielded to the demands of one person, and they banned Bible reading and prayer in our schools. Since then, our country has been on a steady slide downhill." She urged the Board to keep the monument to reverse that trend.

Another speaker urged the members of the Board not to "lay down and let some minority rule us" by ceding to the requests to remove the monument. "They're running over us. Why should we let the few rule so many," he asked, before adding:

> Some day, when you're long gone . . . this will, and I can say this with confidence, this will be your greatest vote that you ever make in your life time . . .

. I promise you, you will be remembered. There is no gray area here. It is black or white. You're gonna either vote for it or not. And whether you're a believer or not, someday you'll stand before God the Creator, Jesus Christ. He'll, he'll judge you. And he might say, "You're apart from me because I don't know you." Or he might say, "Well done, my loyal and faithful servant."

The next speaker said that he could "thump the Bible with the best of them." Instead of doing that, though, he encouraged the Board to stand its ground and "stick up for the people in this town."

Next, a member of the crowd asked, "Who is the family that is protesting this monument?" The School District's solicitor responded that Plaintiffs would likely attempt to proceed anonymously if they filed suit, which drew boos from the crowd. The speaker went on to refer to the Plaintiffs as "yellow-belly bums" for not identifying themselves, a comment which drew applause from the crowd. "I can't see how these people can cause all of these problems and get away with it. What are they scared of? They should be here tonight."

One of the next speakers said she was there to "stand up for the Bible." She continued, "Our forefathers started this country with God in their hearts, minds, and souls said." In closing, she said, "Therefore, as a Christian, I humbly pray and ask this board to keep the Ten Commandments on taxpayer property." Then she held up a sign asking, "What would Pres. Reagan think/say?" that included a number of quotes attributed to the former president, including: "We are never defeated unless we give up on God," "Without God, the republic will not long endure," and "If we ever forget that we are one nation under God, then we are a nation gone under."

One of the final speakers said, "As a Christian . . . I believe in the 10 commandments and everything that they stand for. And I feel that it violates my rights . . . to have someone ask to remove them." She went on to urge the School District to uncover the monument because "it is

disrespectful not only to God to cover up the Ten Commandments, but it is also disrespectful to this country to cover up the American flag [which also appears on the monument]."

Following the public comment period, the members of the School Board unanimously voted to retain the monument "until further notice and pending further legal action." The vote drew a large applause and a standing ovation from the crowd.

On October 21, 2012, about 100 members of the Connellsville community gathered for a vigil at the site of the monument. The vigil coincided with a stop from the "Values Bus," a group touring the country to promote conservative ideals. As the crowd gathered for the vigil, several men removed the plywood covering that had been placed over the monument, with one of them saying, "It's the right of the people to have God in their society." Others at the vigil made similar remarks. Since then, many of the community members who had been rallying in support of the monument have banded together under the name "Thou Shall Not Move." The group, headed by Reverend Marietta, has sold more than 2,000 yard signs supporting the monument. It has used the proceeds of those sales to purchase permanent granite monuments bearing the Ten Commandments and place them at various locations throughout the Connellsville area. Sixteen such monuments have been donated since 2012.

## II.     Standard of Review

Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant must identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are

irrelevant or unnecessary will not be counted." *Id.*

To withstand a motion for summary judgment, the nonmoving party must show a genuine dispute of material fact for trial by citing to particular parts of material in the record. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247-48.

The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c)(1)(A), or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact," Fed. R. Civ. P. 56(c)(1)(B). In reviewing all of the record evidence submitted, the court must draw all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587.

The court is not permitted to weigh evidence or to make credibility determinations at this stage of the proceeding. *Anderson*, 477 U.S. at 255. Those functions are for the jury, not the court. *Id.* The court is thus limited to deciding whether there are any disputed issues of fact and, if so, whether they are both genuine and material. *Id.*

This standard remains the same when the parties have filed cross-motions for summary judgment. *Transguard Ins. Co. of Am., Inc. v. Hinchey*, 464 F. Supp. 2d 425, 430 (M.D. Pa. 2006). "When confronted with cross-motions for summary judgment, . . . 'the court must rule on

each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard.'" *Id.* (quoting *Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 F. App'x. 266, 270 (3d Cir. 2006)). "If review of [the] cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts." *Id.* (citing *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998)).

## III. Discussion

### A. Standing

The Court begins, as it must, with the School District's argument that Plaintiffs lack standing. "Article III of the Constitution limits the judicial power of the United States to the resolution of 'Cases' and 'Controversies' . . ." *Hein v. Freedom from Religion Foundation, Inc.*, 551 U.S. 587, 597-98 (2007) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006)). As a corollary of the "cases and controversies" requirement, a plaintiff must establish standing in order to bring suit in federal court. *Id.* at 598 (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 613 (1989)). The Court set forth the law governing standing at length in *Freedom from Religion Foundation, Inc. v. New Kensington-Arnold School District*, No. 2:12-CV-1319, 2015 WL 4534850, at *4-8 (W.D. Pa. July 27, 2015) and will not repeat that discussion in its entirety. However, a few salient points bear mention.

As explained in *New Kensington*, the Doe Plaintiffs can establish the requisite injury-in-fact by demonstrating that they had "direct, unwelcome contact" with the monument. *Id.* at *8. The contact must be "frequent and regular, not sporadic and remote." *Vasquez v. Los Angeles Cnty.*, 487 F.3d 1246, 1252 (9th Cir. 2007). Furthermore, "[w]hen, as in this case, prospective relief is sought, the plaintiff must show that he is 'likely to suffer future injury' from the

defendant's conduct." *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 223 (3d Cir. 2012) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)).

Here, unlike in *New Kensington*, the "direct, unwelcome contact" standard was satisfied when this lawsuit was filed in September 2012. At that time, Doe 4 was still a seventh grader at Junior High East. Throughout her time at the school, she passed the monument on several occasions, and it was allegedly an affront to her belief system. These contacts, though not as frequent and regular as in some of the cases highlighted in *New Kensington*, nonetheless suffice to establish the requisite injury-in-fact under the prevailing standard.[6] To be sure, Doe 4 could not identify the various other elements on the monument during her deposition, but that in no way detracts from the fact that she felt bothered by its presence on school grounds. Furthermore, at the time this lawsuit was filed, a favorable remedy in the form of an injunction ordering the removal of the monument would have remedied Doe 4's alleged injury. Thus, she has standing.

Since "parents independently have standing to bring constitutional challenges to the conditions in their children's schools," *Donovan ex rel. Donovan v. Punxsutawney Area School Board*, 336 F.3d 211, 217 n.3 (3d Cir. 2003), the Court need not separately address whether Doe 5's contacts with the monument were sufficient to give her standing. Be that as it may, the Court finds that Doe 5's contacts with the monument while Doe 4 attended Junior High East likewise sufficed to allow her to challenge the monument in her own right. Although she stated that she

---

6.     Doe 4 can be distinguished from the pseudonymous plaintiff in the *New Kensington* case on a few bases. Most notably, the plaintiff in *New Kensington* was never even a student at the school where the monument is located. In addition, the *New Kensington* plaintiff could only specifically recall observing the monument one time, and she admitted that she was so young that she did not even understand what the monument said or meant when she observed it. By contrast, Doe 4 recalled encountering the monument on several occasions while she was a student at Junior High East (in gym class and during a fire drill), and she also testified that she was bothered by the monument because she is not religious, and she felt like it sends a pro-religion message.

did not find every one of the Ten Commandments objectionable, that is not dispositive. *See Ahlquist v. City of Cranston ex rel. Strom*, 840 F. Supp. 2d 507, 520 (D.R.I. 2012) ("It is possible to object to the presence of the Prayer Mural without having to find its goals of academic achievement and good sportsmanship offensive."). Nor is the Court persuaded that Doe 5 gave up her right to file suit because she waited until 2012 to raise an objection about the monument, even though she was aware of its presence for some time before that. *See Freethought Soc. of Greater Philadelphia v. Chester Cnty.*, 334 F.3d 247, 255 n.3 (3d Cir. 2003) ("[W]e do not believe that the defendants have demonstrated that Flynn waived her right to bring this action (or that the statute of limitations has expired) because she noticed the plaque in the 1960s but did not bring an action until 2001."); *Tearpock-Martini v. Borough of Shickshinny*, 756 F.3d 232, 238 (3d Cir. 2014) (holding that there is no statute of limitations for Establishment Clause challenges to still-existing religious displays). Finally, inasmuch as Doe 5 is a member of the FFRF, the organization has standing, as well.[7] *See ACLU v. Twp. of Wall*, 246 F.3d 258, 261 (3d Cir. 2001).

### B.    Mootness

There is, however, another justiciability hurdle that Plaintiffs must overcome: mootness. Neither Plaintiffs nor the School District has affirmatively stated so, but it appears, based on

---

7.    The School District points out that Doe 5's membership in FFRF was paid for by the organization and that she was recruited solely for the purpose of this lawsuit. The School District has not, however, cited any authority suggesting that this was improper. *Cf. Citizens Coal Council v. Matt Canestrale Contracting, Inc.*, 40 F. Supp. 3d 632, 642 (W.D. Pa. 2014) ("There is simply nothing inappropriate with an organization engaging in a grassroots effort to recruit members who share common interests with the mission of the organization."). Indeed, it spends just a single paragraph addressing the issue. Absent any citation to authority or meaningful argument by the School District, the Court will not consider whether the circumstances under which Doe 5 became a member of FFRF and a party to this suit defeats the FFRF's claim to associational standing.

Plaintiffs' filings, that Doe 4 is no longer a student at Junior High East.[8] *See, e.g.*, Pls.' CSMF ¶ 24 ("Plaintiff Doe 4 *attended* Junior High East at the time of her deposition, on March 13, 2014."); ¶ 29 ("*While* Doe 4 was a student at Junior High East . . . .") (emphasis added). A close reading of Doe 5's deposition confirms this. According to Doe 5, Doe 4 attended Junior High East for seventh grade during the 2011-2012 school year, eighth grade for part of the 2012-13 school year (she attended a cyber-school for the remainder of the year), and then eighth grade again for the 2013-2014 school year. She would have been in ninth grade and no longer a student at Junior High East during the school year that ended in June 2015 and, thus, at the time the parties filed their cross-motions. As a result, the Court "must address whether [Plaintiffs'] request for injunctive and declaratory relief has become moot" because Doe 4 is no longer a student at Junior High East, where the allegedly offensive display is located. *Donovan*, 336 F.3d at 216. The parties did not raise this issue in their briefs, but the Court must do so *sua sponte* because it affects the Court's jurisdiction. *Id.* (citation omitted).

"Mootness has been described as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997) (citations and quotation marks omitted). "When a student challenges the constitutionality of a school policy, graduation typically moots her claim for injunctive or declaratory relief." *Id.* (citations omitted). By analogy, the same is true if the student has otherwise moved on from "the school in which the [alleged] violation occurred." *Doe v. Mt.*

---

8.      In their filings, Plaintiffs seem to be tip-toeing around the possible mootness issue, not wanting to expressly reveal that Doe 4 is no longer a student at Junior High East. Plaintiffs' counsel is reminded that "[i]t is the duty of counsel to bring to the federal tribunal's attention, 'without delay,' facts that may raise a question of mootness." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 (1997) (quoting *Bd. of License Comm'rs of Tiverton v. Pastore*, 469 U.S. 238, 240 (1985) (*per curiam*)).

*Vernon City Sch. Dist. Bd. of Educ.*, No. 2:08-CV-575, 2010 WL 1433301, at *14 (S.D. Ohio Apr. 6, 2010) (citations omitted). Here, since Doe 4 no longer attends Junior High East, and there is no evidence suggesting that she will have any other reason to visit the school in the future, her claims for injunctive and declaratory relief appear to be moot. That is, the "requisite personal interest that existed at commencement of the litigation" no longer exists. *Arizonans for Official English*, 520 U.S. at 68 n.22.

Our Court of Appeals has recognized, however, that such a change in circumstances "does not automatically render a case moot if the student's claims are 'capable of repetition, yet evading review.'" *Donovan*, 336 F.3d at 216-17 (quoting *Brody ex rel. Sugzdinis v. Spang*, 957 F.2d 1108, 1113-15 (3d Cir. 1992)). This is an "extremely narrow exception . . . applicable only where: 1) the challenged action is too short in duration to be fully litigated before the case will become moot; and 2) there is a reasonable expectation that the complaining party will be subjected to the same action again." *Id.* at 217.

A student about to enter seventh grade at Junior High East who objected to the monument (or that student's parent) would have about two years to litigate the case before exiting the school after eighth grade. This is likely "'too short to complete litigation and appellate review of a case of this complexity.'" *Id* (quoting *Brody*, 957 F.2d at 1113)). Yet, while the present controversy might "evade review," it is not "capable of repetition" with respect to Doe 4. She is no longer a student at Junior High East, and there is nothing in the record to suggest that she will ever again encounter the monument on a frequent and regular basis. *See id.* (holding that action was not "capable of repetition" because there was "no reasonable expectation" that plaintiff would be "subjected to the same action again" since she "graduated and will never again return . . . as a student").

Nor is there anything in the record to suggest that Doe 5's contacts with the monument have continued to the present day. Aside from her substitute teaching position, which ended in 2010, she only had occasion to visit Junior High East because Doe 4 was a student there. Since Doe 4 is no longer a student, all of Doe 5's ties to the school have been severed. If Doe 5 had another child who was still in elementary school in the District, the Court "could potentially find that the present dispute was capable of repetition as to [her]." *Id.* at 217 (citation omitted). She does not, so the Court need not consider this possibility.

Therefore, the Doe Plaintiffs' claims for declaratory and injunctive relief are moot; granting "such relief would have no impact on [them] whatsoever." *Id.* And because FFRF is relying on Doe 5 in order to establish associational standing, it likewise cannot obtain declaratory or injunctive relief. *See* 13C The Late Charles Alan Wright, et al., *Fed. Prac. & Proc. Juris.* § 3531.9.5 (3d ed.).

Plaintiffs, however, also raise a claim for nominal damages in their Complaint. "Nominal damages have traditionally 'vindicated deprivations of certain 'absolute' rights that are not shown to have caused actual injury . . . .'" *CMR D.N. Corp. v. City of Philadelphia*, 703 F.3d 612, 628 (3d Cir. 2013) (quoting *Carey v. Piphus*, 435 U.S. 247, 266 (1978)). There is no question that nominal damages are "an appropriate remedy for a violation of the rights protected by the Establishment Clause." *Moeller v. Bradford Cnty.*, No. 3:05CV334, 2006 WL 319288, at *6 (M.D. Pa. Feb. 10, 2006) (citing *O'Connor v. Washburn Univ.*, 416 F.3d 1216, 1222 (10th Cir. 2005); *Searles v. Van Bebber*, 251 F.3d 869, 878-79 (10th Cir. 2001); *Warner v. Orange Cnty. Dep't of Probation*, 115 F.3d 1068, 1077 (2d Cir. 1996)). But can a request for nominal damages – and *only* nominal damages – save a plaintiff's otherwise moot claim from dismissal?

The Court of Appeals for the Third Circuit has explained that, generally speaking, "the

availability of *damages or other monetary relief* almost always avoids mootness." *Jersey Cent. Power & Light Co. v. New Jersey*, 772 F.2d 35, 41 (3d Cir. 1985) (emphasis added). Most of the time, though, this rule has been applied in cases where a plaintiff sought nominal, compensatory, and punitive damages, or some combination thereof, in addition to equitable relief. *See, e.g.*, *Donovan*, 336 F.3d at 217 (case not moot where plaintiffs sought "nominal damages, presumed damages, and/or compensatory damages" and "punitive damages"); *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 260 (3d Cir. 2007) (case not moot where plaintiffs sought compensatory and punitive damages); *Brown v. Philadelphia Mun. Ct.*, 47 F. App'x 129, 131 (3d Cir. 2002) (case not moot where compensatory damages sought in an addition to injunctive and declaratory relief); *Doe v. Delie*, 257 F.3d 309, 314 (3d Cir. 2001) (holding that a prisoner's claim was saved by his request for nominal and punitive damages, even though he could not recover compensatory damages under the Prison Litigation Reform Act). By contrast, the Court of Appeals does not appear to have ever squarely addressed whether a plaintiff's otherwise moot claim can be saved *solely* by a claim for nominal damages, which is the precise issue here. It has, nonetheless, at least suggested that a valid claim for nominal damages can do so under certain circumstances. *See, e.g.*, *CMR D.N. Corp.*, 703 F.3d at 628 (discussing availability of nominal damages in context of mootness argument); *A.P. Boyd, Inc. v. Newark Pub. Schs.*, 44 F. App'x 569, 571 ((3d Cir. 2003) (refusing to read a claim for nominal damages into the complaint and holding that plaintiff's request for injunctive and declaratory relief was moot).

The clear consensus outside the Third Circuit is that a "valid claim for nominal damages" is sufficient to "avoid mootness." Wright et al., *supra*, § 3533.3; *see, e.g.*, *Morgan v. Plano Independent Sch. Dist.*, 589 F.3d 740, 748 (5th Cir. 2009); *Lynch v. Leis*, 382 F.3d 642, 646 n. 2

(6th Cir. 2004); *Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1257 (10th Cir. 2004); *Van Wie v. Pataki*, 267 F.3d 109, 115 n. 4 (2d Cir. 2001). This rule has not gone without criticism, however. *See, e.g.*, *Utah Animal Rights Coal.*, 371 F.3d at 1263 (McConnell, J., concurring) (arguing that "the proposition that a claim for nominal damages automatically precludes mootness is inconsistent with fundamental principles of justiciability"). In the least, it seems "odd that a complaint for nominal damages could satisfy Article III's case or controversy requirements, when a functionally identical claim for declaratory relief will not." *Id.* at 1257 (majority opinion). But that is the law in the majority, if not all, of the circuits and our own Court of Appeals has suggested that it agrees with it. Thus, the Court concludes that Plaintiff's claim for nominal damages "continue[s] to present a live controversy," and the Court must address the merits of their challenge to the monument. *See Donovan*, 336 F.3d at 217.

### C.     Legal Framework

#### 1.     The Establishment Clause

The Establishment Clause of the First Amendment, made applicable to the states through the Fourteenth Amendment, *Doe v. Indian River School District*, 653 F.3d 256, 269 (3d Cir. 2011), provides that "Congress shall make no law respecting an establishment of religion," U.S. CONST. amend. 1. The Clause is "'designed as a specific bulwark against [the] potential abuses of governmental power.'" *Indian River*, 653 F.3d at 269 (quoting *Flast v. Cohen*, 392 U.S. 83, 104 (1968)) (alteration in original). Consistent with that bedrock principle, both the state and federal governments are prohibited, at a minimum, from

> set[ting] up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support

any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa.

*Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 15 (1947).

Most Establishment Clause cases, however, do not fall within those clear prohibitions. To take into account the myriad ways in which the Clause could be violated, "interlocking lines of cases applying the Clause in particular situations" have developed. *Id.* at 279. Along the way, the United States Supreme Court has announced various so-called tests to analyze whether government action violates the Clause. *See Freedom from Religion Foundation, Inc. v. Connellsville Area Sch. Dist.*, No. 2:12-CV-1406, 2013 WL 869663, at *6 (W.D. Pa. Mar. 7, 2013).

Which of these tests applies to challenges of religious displays on government property is somewhat unclear. *See Freethought*, 334 F.3d at 256. Over time, the three-part test from *Lemon v. Kurtzman*, 403 U.S. 602 (1971) has come to be considered the benchmark. To assess the constitutionality of challenged government conduct under *Lemon*, a court must ask the following: "(1) whether the government practice had a secular purpose; (2) whether its principal or primary effect advanced or inhibited religion; and (3) whether it created an excessive entanglement of the government with religion." *Indian River*, 653 F.3d at 271 (citing *Lemon*, 403 U.S. at 612-13). *Lemon*, however, has been criticized at length. *See, e.g.*, *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 398-99 (1993) (Scalia, J., concurring) (comparing *Lemon* to "some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried"). As recently as 2014, several members of the Court showed their predilection for eschewing *Lemon* altogether in favor of other approaches. *See Town of Greece v. Galloway*, --- U.S. ----, 134 S. Ct. 1811 (2014). Despite

all of the commentary and criticism that has been heaped upon *Lemon*, though, the Supreme Court has never expressly overruled it. *Indian River*, 653 F.3d at 283. And "[d]espite straying from *Lemon* in narrow situations, the Court has consistently applied the *Lemon* test to religious display cases." *Card*, 520 F.3d at 1015. Indeed, in 2005, the Supreme Court reaffirmed the vitality of the *Lemon* test in a case that involved a display of the Ten Commandments. *Id.* at 1013 (citing *McCreary Cnty. v. ACLU of Kentucky*, 545 U.S. 844, 859-66 (2005)). Without clear guidance from the Supreme Court compelling it to do otherwise, our Court of Appeals has also continued to apply *Lemon* in religious display cases. *See, e.g.*, *Freethought*, 334 F.3d at 261; *Modrovich v. Allegheny Cnty.*, 385 F.3d 397, 400 (3d Cir. 2004). When doing so, though, it has modified *Lemon* to incorporate the endorsement test first advanced by Justice O'Connor in *Lynch v. Donnelly*, 465 U.S. 668, 687-94 (1984) (O'Connor, J., concurring) and later adopted by a majority of the Justices in *County of Allegheny v. ACLU*, 492 U.S. 573 (1989).

### 2. *Stone v. Graham*

Irrespective of which so-called Establishment Clause test applies, the Court must also take into account the Supreme Court's decision in *Stone v. Graham*, 449 U.S. 39 (1980) (*per curiam*) – its first decision involving a display of the Ten Commandments. *Stone* involved a Kentucky statute that required the posting of copies of the Ten Commandments on the wall of every classroom in the state. 449 U.S. at 39. The Supreme Court summarily struck down the law under *Lemon*'s first prong, finding that Kentucky's "pre-eminent purpose for posting the Ten Commandments" was "plainly religious." *Id.* at 41. This was so because "[t]he Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths," which "do not confine themselves to arguably secular matters . . . ." *Id.* "Rather, the first part of the Commandments concerns the religious duties of believers: worshipping the Lord God alone,

avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day." *Id.* at 42.

Since the Commandments were not "integrated into the school curriculum" as part of a "study of

history, civilization, ethics, comparative religion, or the like," the Court was left to conclude that

the statute requiring their display was invalid. *Id.* The Supreme Court also clarified that it made

no difference that the Commandments were posted on a wall and not read aloud to the students,

finding it "no defense . . . that the religious practices here may be relatively minor

encroachments on the First Amendment." *Id.* (citation omitted).

> However, as the Third Circuit Court of Appeals has observed, *Stone* did not
>
> hold[] that there can never be a secular purpose or that the Ten Commandments
> are so overwhelmingly religious in nature that they will always be seen only as an
> endorsement of religion; rather . . . *Stone* is fairly limited to its facts. *Stone* held
> that a statute, recently enacted, requiring the posting of the Ten Commandments
> in school classrooms is an endorsement of religion by the state, considering the
> inherently religious nature of the Ten Commandments.

*Freethought*, 334 F.3d at 262. So, in essence, "[w]hatever is left of *Stone* is limited to

circumstances involving public displays of the Ten Commandments in isolation." *ACLU of*

*Kentucky v. Mercer Cnty., Ky.*, 432 F.3d 624, 634 (6th Cir. 2005).

### 3. The Supreme Court's 2005 Ten Commandments Cases

The Court's analysis must also be informed by the Supreme Court's 2005 decisions in

*McCreary County* and *Van Orden*. Our Court of Appeals has not had the occasion to address the

effect, if any, of these two decisions on the continuing application of *Lemon* and the endorsement

test to displays of the Ten Commandments on public property. However, courts in other Circuits

have done so, and this Court will turn to the analysis of those courts for guidance.

#### a. *McCreary County*

In *McCreary County*, the Supreme Court struck down identical displays that included the

Ten Commandments in the courthouses of two Kentucky counties, McCreary County and

Pulaski County. The counties initially posted "large, gold-framed copies" of the Ten Commandments, by themselves, in their courthouses. 545 U.S. at 850-52. The McCreary County display was required to be a in a "very high traffic area of the courthouse," per an order from the county's legislature. *Id.* at 851. Meanwhile, at the unveiling for the Pulaksi County display, the county's judge-executive called the Commandments "'good rules to live by.'" *Id.* He also "recounted the story of an astronaut who became convinced 'there must be a divine God' after viewing the Earth from the moon." *Id.* The judge-executive's pastor was also present, and during his remarks, he "called the Commandments 'a creed of ethics'" and said "that displaying the Commandments was 'one of the greatest things the judge could have done to close out the millennium.'" *Id.*

Prompted by a lawsuit by the ACLU, each county modified its display to include eight other documents in smaller frames with "each either having a religious theme or excerpted to highlight a religious element." *Id.* at 853-54. After the district court entered a preliminary injunction ordering the removal of the displays, the counties modified them again, this time with more arguably secular elements, like the Declaration of Independence and Bill of Rights, included alongside a slightly different version of the Ten Commandments. *Id.* at 854-56. The counties dubbed this "The Foundations of American Law and Government Display," with each document containing a "statement about its historical and legal significance." *Id.* at 855.

Not satisfied with the modifications, the ACLU moved to expand the preliminary injunction to cover the third display. In response, the counties argued that the display was constitutional because it was designed "'to demonstrate that the Ten Commandments were part of the foundation of American Law and Government' and 'to educate the citizens of the county regarding some of the documents that played a significant role in the foundation of our system of

law and government.'" *Id.* The district court dismissed these purportedly secular purposes for displaying the Commandments as a sham, "[i]n light of the Counties' decision to post the Commandments by themselves in the first instance" and then to highlight the religious elements of the documents in the second display. *Id.* Thus, the district court agreed to include the third display in the injunction, and the Sixth Circuit affirmed. *Id.*

The Supreme Court also affirmed. *Id.* at 858. The Court first rejected the counties' entreaty to abandon *Lemon*'s purpose prong. *Id.* at 860-66. Although the Court noted that the purpose prong is rarely dispositive, it reiterated that it "'serves an important function.'" *Id.* at 859 (quoting *Wallace v. Jaffree*, 472 U.S. 38, 75 (1985) (O'Connor, J., concurring)). "When the government acts with the ostensible and predominant purpose of advancing religion,"[9] the Court stressed, "it violates that central Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides." *Id.* at 860 (citations omitted). Next, the Court rejected the counties' argument that "true 'purpose' is unknowable," reasoning that "[e]xamination of purpose is a staple of statutory interpretation" and "an understanding of official objective" can be discerned "from readily discoverable fact, without any judicial psychoanalysis of a drafter's heart of hearts." *Id.* (citations omitted). This analysis is undertaken through the eyes of an "objective observer, one who takes account of the traditional external signs that show up in the text, legislative history, and implementation of the statute, or comparable official act." *Id.* (quotation marks and citations omitted). Finally, the Court was not persuaded by the counties' attempt to trivialize the enquiry into purpose, casting off the notions that "any transparent claim to secularity would satisfy it" and that the purpose enquiry should

---

9.    Some courts have observed that the *McCreary County* Court's use "of 'predominant purpose' signaled a departure from the Court's earlier 'secular purpose' inquiries." *Mercer Cnty.*, 432 F.3d 624, 630 (6th Cir. 2005) (citing *McCreary Cnty.*, 545 U.S. at 901 (Scalia, J., dissenting)).

ignore the history of the challenged display. *Id.* at 863-64. "[T]he secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective." *Id.*

The Court proceeded to apply *Lemon*'s purpose prong, "look[ing[ to the record of evidence showing the progression leading up to the third display of the Commandments." *Id.* at 868. In doing so, it considered *Stone* "the initial leading benchmark" since it was, at the time, the Court's "only case dealing with the constitutionality of displaying the Commandments." *Id.* at 867. "*Stone* recognized that the Commandments are an 'instrument of religion,'" the Court observed, "and that, at least on the facts before it, the display of their text could presumptively be understood as meant to advance religion" because "their isolated exhibition did not leave room even for an argument that secular education explained their being there." *Id.* The Court recognized, though, that *Stone* did not decide that the government can never display the Commandments and that "under the Establishment Clause detail is key." *Id.*

The Court went on to liken the counties' initial display to that which it struck down in *Stone*: "both set out a text of the Commandments as distinct from any traditionally symbolic representation, and each stood alone, not part of an arguably secular display." *Id.* at 868. This was problematic because "*Stone* stressed the significance of integrating the Commandments into a secular scheme to forestall the broadcast of an otherwise clearly religious message . . . ." *Id.* "[F]or good reason," the Court emphasized, since "the Commandments" are "a central point of reference in the religious and moral history of Jews and Christians." *Id.* The Commandments "proclaim the existence of a monotheistic god," "regulate details of religious obligation," and "unmistakably rest even the universally accepted prohibitions . . . on the sanction of divinity proclaim at the beginning of the text." *Id.* So "[w]here the text is set out, the insistence of the religious message is hard to avoid in the absence of a context plausibly suggesting a message

going beyond an excuse to promote the religious point of view." *Id.* Thus, the Court concluded, "the Counties' solo exhibit here did nothing more to counter the sectarian implication than the postings at issue in *Stone*." *Id.* Add to that the statements from the judge-executive's pastor and the fact that the posting "lacked even the *Stone* display's implausible disclaimer," and a reasonable person would be forced to conclude "that the Counties meant to emphasize and celebrate the Commandments' religious message." *Id.*

The Court went on to examine the evolution of the displays and found that the second version was clearly unconstitutional, inasmuch as it highlighted the religious elements of the texts. *Id*. at 870. "The display's unstinting focus was on religious passages, showing that the Counties were posting the Commandments precisely because of their sectarian content." *Id.* The "serial religious references and the accompanying resolution's claim about the embodiment of ethics in Christ" eliminated any doubt about the counties' purpose. *Id.* As to the third display, in part because there was no new authorizing action for the third display and in part because the third display "quoted more of the purely religious language of the Commandments than the first two displays had done," the Court concluded that "[n]o reasonable observer could swallow the claim that the Counties had cast off the objective so unmistakable in the earlier displays." *Id.* at 871-72. And, according to the Court, the other posted materials did not "suggest a clear theme that might prevail over evidence of the continuing religious object." *Id.* at 872.

At the same time, the Court made clear that its holding did not mean "that a sacred text can never be integrated constitutionally into a governmental display on the subject of law, or American history." 545 U.S. at 874. For example, the Court noted that no reasonable observer would view the frieze in the Supreme Court's own courtroom depicting "Moses holding tablets exhibiting a portion of the Hebrew text of the later, secularly phrased Commandments" as an

having a religious purpose since "17 other lawgivers, most of them secular figures," were also depicted. *Id.* at 874.

### b. *Van Orden*

In *Van Orden*, neither the plurality nor Justice Breyer, who provided the crucial fifth vote, applied *Lemon* in upholding the display of an Eagles-donated Ten Commandments monument on the grounds of the Texas State Capitol. 545 U.S. at 685 (plurality); *id.* at 700 (Breyer, J., concurring in the judgment). The Texas State Capitol is surrounded by 22 acres of land, "contain[ing] 17 monuments and 21 historical markers commemorating the 'people, ideals, and events that compose Texan identity.'" *Id.* at 681 (quoting Texas H. Con. Res. 38, 77th Leg., Reg. Sess. (2001)). The Ten Commandments monument there is virtually identical to the one at Junior High East (except, as discussed *supra*, the version of the Commandments is slightly different). *Id.* at 681-82.

Writing for the four-Justice plurality, Chief Justice Rehnquist cast *Lemon* aside, finding it "not useful in dealing" with cases involving "passive" displays. *Id.* In his view, the analysis must instead be "driven both by the nature of the monument and by our Nation's history." *Id.* "Texas has treated its Capitol grounds monuments as representing the several strands in the State's political and legal history," the plurality reasoned. *Id.* at 691. "The inclusion of the Ten Commandments monument in this group has a dual significance, partaking of both religion and government," and thus the plurality found it constitutional. *Id.* at 691-92. For the plurality, the monument was essentially akin to the many permissible depictions of the Commandments – like that found in the Supreme Court's own courtroom – common throughout the country. *Id.* at 688-89. And while Chief Justice Rehnquist acknowledged the religious significance of the Commandments, he concluded that "[s]imply having a religious content . . . does not run afoul of

the Establishment Clause." *Id.* at 690. Before concluding, the plurality distinguished *Stone* because it relied exclusively on the school-prayer line of cases and, as such, "stands as an example of the fact that [the Court has] 'been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools.'" *Id.* at 690-91 (quoting *Edwards v. Aguillard*, 482 U.S. 578, 583-84 (1987)). Along similar lines, Chief Justice Rehnquist reasoned that the monument at issue was "far more passive" than the display in *Stone*, which "confronted elementary school students every day." *Id.* at 691. Further distinguishing *Stone*, Chief Justice Rehnquist opined that there was nothing in the record to suggest that Texas acted with a "primarily religious purpose."[10] *Id.* at 691 n.11.

Justice Breyer wrote separately, concurring in the judgment, and his opinion has come to be viewed as controlling under the rule of *Marks v. United States*, 430 U.S. 188, 193 (1977). *See Card*, 520 F.3d at 1017 n.10; *Green*, 568 F.3d at 807 n.17. He began by recognizing that "the Court has found no single mechanical formula that can accurately draw the constitutional line in every case." *Id.* In his view, the "tests" that the Court has announced do not always adequately explain why certain things are permissible – e.g., the references to God on our currency – while others are not. *Id.* Justice Breyer thus proposed that in "difficult borderline cases" there is "no test-related substitute for the exercise of legal judgment." *Id.* at 700. "That judgment . . . must reflect and remain faithful to the underlying purposes of the [Establishment and Free Exercise] Clauses, and it must take account of context and consequences measured in light of those purposes." *Id.* (citation omitted). The purposes identified by Justice Breyer were: (1) assuring the

---

10. What the Chief Justice meant by this is not clear, for in *Stone*, it was not as though the government's impermissible purpose was lurking somewhere in the background, waiting to be uncovered. Rather, "the *government action itself* bespoke the purpose." *McCreary Cnty.*, 545 U.S. at 862 (emphasis added).

"fullest possible scope of religious liberty and tolerance for all," (2) minimizing religious divisiveness; (3) maintaining the "separation of church and state," (4) and "further[ing] the basic principles set forth" in Justice O'Connor's concurring opinion in *McCreary County*.[11] *Id.* Although Justice Breyer called the Court's other Establishment Clause tests "useful guideposts," he emphasized that "no exact formula can dictate a resolution to such fact-intensive cases." *Id.*

Texas's Ten Commandments monument, in Justice Breyer's estimation, presented a borderline case. "On the one hand," the Commandments "undeniably" send "a religious message." *Id.* Still, Justice Breyer explained, the text of the Commandments cannot be viewed in isolation. *Id.* at 701. One must instead "examine how the text is *used*. And that inquiry requires us to consider the context of the display." *Id.* (emphasis in original). Sometimes, for example, the Commandments can be used to send a "secular moral message (about proper standards of social conduct)." *Id.* "[A] display of the tablets can also convey a historical message (about a historic relation between those standards and the law) – a fact that helps to explain the display of those tablets in dozens of courthouses through the Nation . . . ." *Id.*

To Justice Breyer, "[t]he circumstances surrounding the display's placement on the capitol grounds and its physical setting suggest[ed] that the State itself intended the latter, nonreligious aspects of the tablets' message to predominate." *Id.* Justice Breyer identified a few factors that led to that conclusion: the Eagles, "while interested in the religious aspect of the Ten Commandments, sought to highlight the Commandments' role in shaping civic morality," *id.* at 701; the monument was displayed in a large park among 17 other monuments and 21 historical markers "designed to illustrate the 'ideals' of those who settled Texas and of those who have

_____

11. According to Justice O'Connor, "the goal of the [Establishment and Free Exercise] Clauses is clear: to carry out the Founders' plan of preserving religious liberty to the fullest extent possible in a pluralistic society." *McCreary Cnty.*, 545 U.S. 882 ("O'Connor, J., concurring).

lived there since that time;" and the setting of the monument did not "lend itself to meditation or other religious activity," *id.* at 702. While these factors strongly suggested that the monument "convey[ed] a predominantly secular message," the fact that 40 years had passed without anyone legally challenging the monument was "determinative" for Justice Breyer. *Id.* at 702. "[T]hose 40 years suggest more strongly than can any set of formulaic tests that few individuals" viewed "the monument as amounting . . . to a government effort" to favor one religion over another, to promote religion over nonreligion, "to engage in any religious practice, to compel any religious practice, or to work deterrence of any religious belief." *Id.* (citations and quotations omitted). Justice Breyer was also closely attuned to the practical consequences of ordering the removal of the monument, observing that doing so "might well encourage disputes concerning the removal of longstanding depictions of the Ten Commandments from public buildings across the Nation," which would lead to the type of religious divisions the Establishment Clause was designed to prevent. *Id.* at 704.

Like the justices in the plurality, Justice Breyer took pains to distinguish *Stone*, opining that Texas's monument "is not on the grounds of a public school . . . ." *Id.* at 703. Possibly attempting to head off the confusion that would arise by the split decisions in *McCreary County* and *Van Orden* (and his vote to strike down one display and uphold the other), Justice Breyer also attempted to distinguish these two cases. As he viewed the matter, "the short (and stormy) history" of the displays in *McCreary County* "demonstrates the substantially religious objectives of those who mounted them, and the effect of this readily apparent objective upon those who view them." *Id.* "That history . . . indicates a governmental effort substantially to promote religion, not simply an effort primarily to reflect, historically, the secular impact of a religiously inspired document." *Id.* Justice Breyer added that "a more contemporary state effort to focus

attention upon a religious text is certainly likely to prove divisive in a way that this longstanding, pre-existing monument has not." *Id.*

<strong>c.      Aftermath of <em>McCreary County</em> and <em>Van Orden</em></strong>

These divergent opinions, like so much else in the murky milieu of Establishment Clause jurisprudence, have sowed confusion among the Courts of Appeals, leaving them "divided over whether *Lemon* continues to control the Establishment Clause analysis of public displays." *Green v. Haskell Cnty. Bd. of Comm'rs*, 574 F.3d 1235, 1245 (10th Cir. 2009) (Kelly, J., dissenting from the denial of rehearing *en banc*). Some courts have continued to apply *Lemon*. *Green v. Haskell Cnty. Bd. of Comm'rs*, 568 F.3d 784, 797 n.8 (10th Cir. 2009) (refusing to apply *Van Orden* and instead applying *Lemon* to invalidate a Ten Commandment display surrounded by secular monuments outside a county courthouse); *Mercer Cnty.*, 432 F.3d at 631-40 (applying *Lemon* and holding that the challenged display at the local courthouse, which was identical to the third version of the display in *McCreary County*, did not violate the Establishment Clause). The Eighth Circuit, however, has held that *Van Orden* and not *Lemon* controls in cases involving passive displays of the Ten Commandments. *ACLU Nebraska Found. v. City of Plattsmouth, Neb.*, 419 F.3d 772, 778 & n.8 (8th Cir. 2005) (*en banc*) ("[t]aking [its] cue from Chief Justice Rehnquist's opinion for the Court and Justice Breyer's concurring opinion in *Van Orden*"); *Red River Freethinkers v. City of Fargo*, 764 F.3d 948, 949 (8th Cir. 2014) ("A passive display of the Ten Commandments on public land is evaluated by the standard in *Van Orden v. Perry* . . . ."). The Ninth Circuit, "[r]eading *Van Orden* and *McCreary* together," has adopted a slightly different approach. *Card*, 520 F.3d at 1021. In its view, "a limited exception to the *Lemon* test exists in contexts closely analogous to that found in *Van Orden*." *Id.* Thus, "*Lemon* . . . remains the general rule for evaluating whether an Establishment Clause

violation exists." *Id.* at 1016 (citations omitted). However, *Lemon* does not apply in cases involving "longstanding plainly religious displays that convey a historical or secular message in a non-religious context." *Id.* "Unfortunately," as the Ninth Circuit has observed, "Justice Breyer did not explain in detail how to determine whether a case was borderline and thus less appropriate for the typical *Lemon* analysis." *Trunk v. City of San Diego*, 629 F.3d 1099, 1107 (9th Cir. 2011).

Consequently, when faced with an Establishment Clause challenge to a display depicting the Ten Commandments, courts are essentially left to ask whether a case is factually similar to *Van Orden*. *See* Jay A. Sekulow & Francis J. Manion, *The Supreme Court and the Ten Commandments: Compounding the Establishment Clause Confusion*, 14 WM. & MARY BILL RTS. J. 33, 47 (2005). "[C]ases like *Van Orden* should come out like *Van Orden*." *Green*, 574 F.3d at 1249 (Gorsuch, J., dissenting from the denial of rehearing *en banc*); *see also McCreary Cnty.*, 545 U.S. at 912 n.14 ("In general, like displays tend to show like objectives and will be treated accordingly."); *Red River Freethinkers*, 764 F.3d at 948 ("*Van Orden* and *Plattsmouth* control here unless this monument is different."). Making this determination requires the Court to consider the "circumstances surrounding the display's placement," the display's context and physical setting, how long the display has been in place, and whether the display has ever been legally challenged. *Van Orden*, 545 U.S. at 701-03 (Breyer, J., concurring in the judgment). At the same time, the paramount teaching of *McCreary County* cannot be forgotten: "When the government initiates an effort to place [the Ten Commandments] alone in public view, a religious object is unmistakable." 545 U.S. at 869.

Taking this approach, three district courts have followed *Van Orden* and upheld monuments similar to the one in this case. *See Twombly v. City of Fargo*, 388 F. Supp. 2d 983,

986-90 (D.N.D. 2005) (finding that *Lemon* did not apply because the monument at issue was "nearly uniform in appearance and character" to the one in *Van Orden*); *Russelburg v. Gibson Cnty., Ind.*, No. 3:03-CV-149-RLY-WGH, 2005 WL 2175527, at *2 (S.D. Ind. Sept. 7, 2005) (upholding an Eagles-donated Ten Commandments monument on courthouse grounds that was surrounded by six other monuments and memorials because "the similarities between this case and *Van Orden* are too vivid to dismiss"); *ACLU v. Bd. of Comm'rs of Lucas Cnty.*, 444 F. Supp. 2d 805, 815 (N.D. Ohio 2006) (calling *Van Orden* the "most factually similar case"). None of these cases, however, involved isolated monuments on school grounds.[12]

### 4.      *Town of Greece*

Before turning to the application of these principles to the facts of this case, the Court must pause for a moment to address the Supreme Court's recent decision in *Town of Greece*, 188 S. Ct. at 1819. The School District relies on *Town of Greece* for the proposition that "the evidence demonstrating a historical practice of dedicating Eagles' Monuments for the sole purpose of promoting a moral code, and not for religious purposes, must be observed." Def.'s

---

12.      *Twombly* did, however, involve a monument that was "not surrounded by a collection of secular monuments." 388 F. Supp. 2d at 991. The court did not find that factor dispositive, however, concluding instead that "the presence of secular monuments, as in *Van Orden*," is just one "factor[] in determining whether, in the aggregate, a monument's religious message is attributable to the state." *Id.* The Court does not find *Twombly* persuasive since the validity of some of its reasoning has been called into question by the Supreme Court's decision in *Pleasant Grove v. Summum*, 555 U.S. 460 (2009). A large portion of *Twombly* was spent discussing whether a reasonable observer would attribute the message on the monument to the city. 388 F. Supp. 2d at 990-92. The court concluded, in relevant part, that the "grassy mall area" where the monument was located constituted a "public forum," such that the "religious opinions expressed in this locale, as opposed to speech that would occur inside of, say, a courthouse, is less likely to be seen as the exclusive dominion of the state." *Id.* at 992. But as the Supreme Court held in *Summum*, "forum analysis simply does not apply to the installation of permanent monuments on public property." 555 U.S. at 480. Rather, "[p]ermanent monuments displayed on public property typically represent government speech." *Id.* at 470. As the Court explained, a reasonable observer would not be confused about whether a monument on public grounds conveyed a message on the government's behalf; it certainly does. *Id.* at 471.

Resp. in Opp. at 11. The Court is not persuaded that *Town of Greece* is applicable in this case or requires a different analysis from that set forth *supra*.

In *Town of Greece*, the Supreme Court upheld the town's practice of opening its board meetings with a prayer. 134 S. Ct. at 1816. As the Sixth Circuit recently explained:

> Relying heavily on *Marsh v. Chambers*, 463 U.S. 783 (1983) – a prior case upholding legislative prayer in a state legislature – the *Town of Greece* Court explained that "the Establishment Clause must be interpreted by reference to historical practices and understandings." *Town of Greece*, 134 S. Ct. at 1819 (internal quotation marks omitted). The Justices therefore interpreted the Establishment Clause by reference to the fact that legislative prayer was an accepted practice at the time the First Amendment was being debated and ratified. *See id.* at 1818–19. "That the First Congress provided for the appointment of chaplains only days after approving language for the First Amendment demonstrates that the Framers considered legislative prayer a benign acknowledgment of religion's role in society." *Id.* at 1819. At the state and local levels, too, legislative prayer has long been accepted. *Id.* Given the long-established practice, the Court deemed it unnecessary to apply any specific test to determine compliance with the Establishment Clause. Instead, it interpreted the contours of the Clause as embracing the historical practice. *See id.* The town's practice of legislative prayer – even sectarian prayer – was constitutional because it did not "fall outside the tradition [the] Court has recognized." *Id.* at 1824.

*Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 788 F.3d 580, 588 (6th Cir. 2015).

The pure historical approach, however, "is of limited utility in this case." *Id.* While depictions of the Ten Commandments are somewhat common in our public spaces, the School District has not offered anything to suggest that the "specific practice" of posting the Ten Commandments outside of schools has long been "permitted" or "was accepted by the Framers and has withstood the scrutiny of time and political change." *Town of Greece*, 134 S. Ct. at 1819. As the Sixth Circuit observed, there were no public schools as we know them during the founding era. *Smith*, 788 F.3d at 588. "Historical practices, therefore, do little to answer the question" in this case. *Id.* Furthermore, although the *Town of Greece* Court did not apply *Lemon*, it did not overrule it either. Nor did it give any "indication that [it] intended to completely

displace the endorsement test." *Id.* at 589. Therefore, *Lemon*, as modified by the endorsement test, will guide the Court's analysis here.

### D. Application

It is with these principles in mind that the Court must assess the constitutionality of the Ten Commandments monument at issue in this case. To begin, the Court must ask whether this case is different from *Van Orden* in any meaningful way. The Court concludes that, on balance, it is. Therefore, the Court will go on to apply the *Lemon* test.

#### 1. *Van Orden* Distinguished

Although the monuments themselves are almost identical, there are at least two factors that distinguish this case from *Van Orden*, such that it does not control the outcome. First, the monument in *Van Orden* was displayed "in a large park containing 17 monuments and 21 historical markers." *Van Orden*, 545 U.S. at 702 (Breyer, J., concurring in the judgment). This setting "provide[d] a context of history and moral ideals" and sent a message "to visitors that the State sought to reflect moral principles, illustrating a relation between ethics and law that the State's citizens, historically speaking, have endorsed." *Id.* "That is to say, the context suggests that the State intended the display's moral message – an illustrative message reflecting historical 'ideals' of Texans – to predominate." *Id.* Conversely, the monument in this case stands alone, prominently displayed outside one of the entrances to the school with a sidewalk just 14 feet away, which leads visitors and students to pass it.[13] *See Modrovich*, 385 F.3d at 414 (explaining

---

13. The School District submits that there are "at least twenty-three (23) other sectarian dedications, displays, and the like" elsewhere "on school grounds." Def.'s CSMF ¶ 34. There are two problems with this argument. First, a number of the "displays" included in the School District's tally – e.g., a street sign dedicated to former Olympian John Woodruff, a sign above the press box at the football field dedicating it to a community member, a sign on a building dedicating it to former Heisman Trophy winner Johnny Lujack, and the scoreboard and sign at a baseball field dedicating them to a community member – are in no way similar to the Ten

that when a Ten Commandments "monument stands alone" it "lacks the kind of historical context" necessary to prevent a reasonable observer from perceiving "an endorsement of religion"). There has been no effort on the part of the School District to impart "a broader moral and historical message" by displaying the monument alongside or nearby other secular monuments or displays. *Id.* at 703. Not only does the monument stand alone, but it stands alone "on the grounds of a public school, where," as Justice Breyer explained, "given the impressionability of the young, government must exercise particular care in separating church and state." *Van Orden*, 545 U.S. at 703 (Breyer, J., concurring in the judgment). To be sure, this statement was *dicta*, but it at least hints that the outcome very well may have been different if, as here, the *Van Orden* monument was singularly displayed at a school.

The Court recognizes that this monument, like the one in *Van Orden*, has apparently stood unchallenged for decades. This could suggest that the monument has not been viewed as an endorsement of religion.[14] As our Court of Appeals has stressed, however, "history is only part

_____

Commandments monument. Second, and perhaps more importantly, the School District has not indicated where these various "displays" are in relation to the monument. Thus, the Court does not find these items relevant to deciding whether the monument contravenes the Establishment Clause. *See Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 598 n.48 (1989) ("The presence of Santas or other Christmas decorations elsewhere in the county courthouse, and of the nearby gallery forum, fail to negate the endorsement effect of the crèche."). For the same reason, the fact that there is – or *may be* – a copy of the Declaration of Independence displayed in a classroom somewhere in the School District, as Dr. Lujetic testified, in no way alters the meaning of monument that sits alone outside the school.

14.    Whether the passage of time should be a determinative factor is debatable. *See, e.g.*, *Allegheny*, 492 U.S. at 630 (O'Connor, J., concurring) ("Historical acceptance of a practice does not in itself validate that practice under the Establishment Clause if the practice violates the values protected by that Clause, just as historical acceptance of racial or gender based discrimination does not immunize such practices from scrutiny under the Fourteenth Amendment."). It could mean that no one in the community saw the display as constitutionally problematic. But it could just as easily mean that most people believed that the monument conveyed a religious message but never raised an objection because they agreed with that message. The community's outcry in response to Plaintiffs' challenge points in that direction.

of the context of a display." *Freethought*, 334 F.3d at 260 n.10. "[H]istoric artifacts and monuments" carry with them no "presumption of constitutionality," and "displays that do have the effect of endorsing religion" cannot be "held to be constitutional simply because of their age." *Id.* Therefore, while this factor was dispositive in *Van Orden*, where the monument was surrounded by other monuments as part of a broader moral and historical display, it is not dispositive here. For the context of the Connellsville monument – both its physical context and its historical context – is different. The Court must instead consider whether the monument survives *Lemon*, as modified by the endorsement test, taking into account "the age and relevant history surrounding the use of the display as part of the context in which the reasonable observer views it." *Id.*

### 2. *Lemon* Applied

As already discussed, "under *Lemon*, 'the challenged action is unconstitutional if (1) it lacks a secular purpose, (2) its primary effect is to either advance or inhibit religion, or (3) it fosters an excessive entanglement of government with religion.'" *Indian River*, 653 F.3d at 282 (quoting *Modrovich*, 385 F.3d at 400).

### a. Secular Purpose Prong

Part one of the test, the secular purpose prong, asks "whether government's actual

---

Furthermore, Justice Breyer only considered the lack of legal challenges relevant because there was no indication that it was "due to a climate of intimidation." 545 U.S. at 702 (Breyer, J., concurring in the judgment). The Court will not go so far as to say that such a "climate of intimidation" prevented earlier challenges to the monument here. However, the public's outcry in response to the complaint about the monument – and the vitriolic statements directed at Plaintiffs – at least suggests that "the risk of social ostracism" could have been a "powerful[] deterrent." *Id.* at 747 (Souter, J., dissenting). In fact, Doe 5 testified that she worried about raising an objection earlier because she feared it might jeopardize her substitute teaching job.

purpose is to endorse or disapprove of religion."[15] *Indian River*, 653 F.3d at 282 (internal quotation marks and citation omitted). A challenged action will survive this inquiry if the government had "*some* secular purpose." *Id.* at 283 (citations omitted) (emphasis in original). "The stated secular purpose, however, must be sincere and not a mere sham." *Id.* Moreover, in analyzing whether the School District acted with a secular purpose, the Court must consider two periods of time: 1957, when the School District accepted the monument; and 2012, when the School Board voted to retain the monument after Plaintiffs' request to have it removed. *See Freethought*, 334 F.3d at 262 ("[A]ny inquiry into the County's purpose would require consideration not only of the County's original purpose for displaying the plaque in 1920, but also of the Commissioners' purpose for leaving the plaque in place in 2001, when Flynn requested that it be removed.") (citation omitted).

There is no evidence in the record about why the School District initially accepted the monument. That being the case, the School District argues that the Court should presume that it shared the Eagles' stated secular reason for donating the monument – i.e., to promote morality among young people – and, in effect, wanted to endorse that same message. However, as the Supreme Court has explained, "it frequently is not possible to identify a single 'message' that is conveyed by an object or structure, and consequently, the thoughts or sentiments expressed by a government entity that accepts and displays such an object may be quite different from those of either its creator or its donor." *Pleasant Grove City v. Summum*, 555 U.S. 460, 476 (2009). In

---

15.    *McCreary County*'s effect on the purpose analysis is still being worked out in the circuits. *Compare Skoros v. City of New York*, 437 F.3d 1, 22 (2d Cir. 2006) (explaining that *McCreary County* requires courts to engage in two separate inquiries: the first is to consider the government's "actual purpose" and the second is to consider "how the government's purpose is perceived by an objective observer") *with Catholic League for Religious & Civil Rights v. City & Cnty. of San Francisco*, 567 F.3d 595, 601 n.7 (9th Cir. 2009) *on reh'g en banc*, 624 F.3d 1043 (9th Cir. 2010) (which disagreed with the Second Circuit's approach and concluded that the reasonable observer is simply used to assess the government's actual purpose).

other words, "[b]y accepting a privately donated monument and placing it on [government] property, a [government entity] engages in expressive conduct, but the intended and perceived significance of that conduct may not coincide with the thinking of the monument's donor or creator." *Id.* Accordingly, the Court cannot simply presume that the School District shared the Eagles' purpose when it accepted the monument. The fact of the matter is we don't know why the School District accepted the monument and chose to display it. Presumably, it would not have accepted a monument whose message it disagreed with, but there could have been other factors involved, as well. *See id.* ("By accepting monuments that are privately funded or donated, government entities save tax dollars and are able to acquire monuments that they could not have afforded to fund on their own.").

Even if the Court could presume that the School District shared the Eagles' purpose and wanted to convey the same message, it is not clear on this record that the Eagles' predominant purpose in donating the monument was secular. As the Supreme Court made clear in *McCreary County*, when, as here, the Commandments are placed "alone in public view, a religious object is unmistakable." 545 U.S. at 868. True, in *McCreary County*, the counties took the initiative in posting the Commandments, whereas in this case, the monument was donated by a private entity. But "[n]o viewer could reasonably think that [the monument] occupies this [its location outside the school] without the support and approval of the government." *Allegheny*, 492 U.S. at 599; *see also Summum*, 555 U.S. at 471. Moreover, upon hearing the religiously motivated statements at the dedication ceremony, "[t]he reasonable observer could only think that the" Eagles and, in turn the School District (again, assuming, that the Court can impute the Eagles' intent to the School District) "meant to emphasize and celebrate the Commandments' religious message." *McCreary Cnty.*, 545 U.S. at 869.

Ultimately, however, "the primary focus" must be "on the events of the time at which the [School District] refused to remove the [monument] rather than the events of [1957] when the display was erected." *Modrovich*, 385 F.3d at 410. By that time, the monument had stood on the grounds of the school for more than 50 years, "all the while taking on the mantel of history and tradition." *Ahlquist*, 840 F. Supp. 2d at 521. The Court must therefore examine "the motivations of the current [School District officials] who have power over the decision of whether to remove the [monument]." *Modrovich*, 385 F.3d at 411.

Here again, however, there is scant evidence as to why the members of the School Board voted to retain the monument. The limited evidence that does exist consists of stray comments by Board President Detwiler and Dr. Lujetic, both of whom suggested that the Board was swayed by the "groundswell of public opinion" in favor of retaining the monument and wanted to do so for historic reasons. These statements, however, are of questionable relevance in determining why the Board, as a whole, voted to keep the monument. *Cf. S. Carolina Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1261 (4th Cir. 1989) ("It is manifestly impossible to determine with certainty the motivation of a legislative body by resorting to the utterances of individual members thereof . . . since there is no way of knowing why those, who did not speak, may have supported or opposed the legislation.").

Plaintiffs nevertheless urge the Court to conclude that the School District changed course and decided to retain the monument "to promote and embrace the religious message that the community identified in the monument." Pls.' Br. in Supp. of Mot. Summ. J. at 32-33. "A reasonable observer" viewing the School District's actions, Plaintiffs argue, would conclude that they were "taken to perpetuate the message that a particular religious belief is favored and preferred in Connellsville." *Id.* at 33. It cannot be denied that the public outcry in support of

keeping the monument was tinged with religious overtones. Indeed, the public comment period that preceded the Board's vote to keep the monument sounded, at times, like a religious revival, complete with not-so-veiled references to eternal damnation for anyone who voted against keeping the monument. At the same time, there is case law supporting the view that the Court cannot "impute an impermissible purpose to advance religion to an elected official merely because he responds to a religiously motivated constituent request." *Peck v. Upshur Cnty. Bd. of Educ.*, 155 F.3d 274, 281 (4th Cir. 1998); *see also Modrovich*, 385 F.3d at 412 (concluding that statements by "County residents through letters" showing their religiously motivated support for keeping a Ten Commandments plaque were not relevant to the purpose inquiry because "[n]one of these individuals was the decision-maker for the County with respect to the Plaque"). By voting to retain the monument, the members of the School Board did not necessarily endorse the meaning ascribed to the monument by those who spoke in favor of keeping it on school grounds. In actuality, the members of the Board, as elected officials, were likely motivated by a desire to be responsive to their constituents and maintain their respective public positions. It is not clear whether that motivation is relevant to the secular purpose inquiry under *Lemon*.

The burden to establish a secular purpose, however, falls squarely on the School District. In the Court's view, it has not supported that burden with adequate evidence. For, as in *McCreary County* and *Stone*, the School District's actions in deciding to keep the stand alone Ten Commandments monument, itself, bespeaks a predominantly religious purpose. *See McCreary Cnty.*, 545 U.S. at 862. In any event, assuming that the Court could find that the School District acted with a secular purpose in accepting and maintaining the monument, the Court would nonetheless conclude that the monument has the primary effect of endorsing religion and thus fails the second prong of *Lemon*.

### b. Primary Effect / Endorsement Prong

Part two of the *Lemon* test, the primary effect prong, mandates that "a state's practice can neither advance, nor inhibit religion." *Indian* River, 653 F.3d at 284. This "prong of *Lemon* is akin, if not identical, to the endorsement test." *Id.* Under the endorsement test, "regardless of purpose, the government practice cannot symbolically endorse or disapprove of religion." *Id.* (citation and quotation marks omitted). The Court thus "must determine whether, under the totality of the circumstances, the challenged practice conveys a message favoring or disfavoring religion." *Id.* at 284. "In doing so," the Court "adopt[s] the viewpoint of the reasonable observer." *Id.* That is to say, the Court is not permitted to "ask whether there is any person who could find an endorsement of religion, whether some people may be offended by the display, or whether some reasonable person might think [the State] endorses religion." *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 779 (1995) (Connor, J., concurring in part and concurring in the judgment) (citation omitted). For "[t]here is always someone who, with a particular quantum of knowledge, reasonably might perceive a particular action as an endorsement of religion." *Id.* Rather, the Court must conjure up a "reasonable observer . . . similar to the reasonable person in tort law, who is not to be identified with any ordinary individual, who might occasionally do unreasonable things, but is rather a personification of a community ideal of reasonable behavior, determined by the [collective] social judgment." *Id.*

Our Third Circuit Court of Appeals described the attributes of the reasonable observer at some length in *Freethought* and *Modrovich*. As the Court of Appeals explained, "[T]he reasonable observer is more knowledgeable than the uninformed passerby." *Freethought*, 334 F.3d at 259. Not only is he aware of the display's surrounding physical context, but he is also presumed to be "aware of the age and history of the [display]." *Id.* at 262. As part of that history,

the reasonable observer is aware of the display's donor, and the circumstances surrounding its donation and acceptance. *Modrovich*, 385 F.3d at 407, 410. The reasonable observer also knows whether the state has done anything "to celebrate or highlight" the display during its existence. *Freethought*, 334 F.3d at 262. This understanding of "the *age* and *history* of the [display] provide[s] a context" that can alter "the effect of an otherwise religious [display]." *Id.* at 264 (emphasis in original). "History by itself," though, "may not be sufficient to change an otherwise religious display into something that is not perceived by the reasonable observer as an endorsement of religion." *Id.* at 266 (citing *Allegheny*, 492 U.S. at 630 (O'Connor, J., concurring)).

"The school context changes these objective inquiries only slightly." *Weinbaum v. City of Las Cruces, N.M.*, 541 F.3d 1017, 1032 (10th Cir. 2008). Because attendance at schools is involuntary and schoolchildren are viewed as impressionable, "a slightly different objective observer" must be conjured to assess a challenge to a religious display on school grounds. *Id.* As the Second Circuit Court of Appeals has instructed, "[T]he relevant objective observer . . . is an adult who is 'aware of the history and context of the community and forum in which the religious display appears and who understands that the display of a religious symbol in a school context may raise particular endorsement concerns, because of the pressure exerted on children by the law of imitation." *Skoros v. City of New York*, 437 F.3d 1, 30 (2d Cir. 2006) (citations and quotation marks omitted).

In sum, then, "the question is, would a passerby" with all of these attributes reasonably believe that by declining to remove the monument, the School District "was endorsing religion?" *Freethought*, 334 F.3d at 264. Although this is a close question, the Court concludes that the reasonable observer would arrive at such a conclusion. The content of the monument, its location

on school grounds, the lack of secular displays in reasonable proximity to the monument, and the events leading up to the Board's decision to retain the monument compels such a result.

The Ten Commandments have what our Court of Appeals has described as a "primar[ily] religious significance." *Id.* at 265. That conclusion is hard to avoid when viewing the monument here, inasmuch as it prominently proclaims, in letters slightly larger than those elsewhere on the monument, "I AM the LORD thy God." It was thus incumbent on the School District to demonstrate that the religious nature of the monument was meant to be overshadowed by some secular or historical message. It has not done so, for the context of the monument does nothing to detract from the Commandments' overwhelmingly religious message.[16] Just the opposite: Displaying the Commandments alone in a prominent location outside the school only serves to highlight the religious aspects of the Commandments, sending "an unmistakable message that [the School District] supports and promotes" the religious message that is at the heart of the Commandments. *See McCreary Cnty.*, 545 U.S. at 868. The reasonable observer's awareness of the statements made by the representatives of the Eagles at the dedication ceremony would serve to further highlight the religious nature of the display.

Of course, the reasonable observer's "primary focus" would be the events of 2012, when

---

16.     The School District argues that the monument is "undeniably part of a secular display." Def.'s Br. in Supp. Mot for Summ. J. 13. Since there are no other monuments or displays anywhere nearby, the School District apparently bases this argument on the content of the monument, itself. The Court disagrees that the presence of the other symbols on the monument detracts from the religious message of the Ten Commandments. As another court has observed, "The Ten Commandments occupy the bulk of the surface area and accordingly plainly dominate the monument." *Adland v. Russ*, 307 F.3d 471, 486 (6th Cir. 2002). "Moreover, if an individual reads the monument, the first feature he or she would encounter would be the prefatory words 'I AM the LORD thy God' set out in large lettering at the top of the text." *Id.* "The bottom of the monument also conveys an unambiguously religious message – it features two Stars of David and the Chi Rho Christ symbol." *Id.* While "two religious traditions, rather than one," are acknowledged, this does not change the result, for "'[t]he simultaneous endorsement of Judaism and Christianity is no less constitutionally infirm than the endorsement of Christianity alone.'" *Books*, 235 F.3d at 307 (quoting *Allegheny*, 492 U.S. at 615).

the School District decided to retain the monument. *Modrovich*, 385 F.3d at 410. And viewing those events would confirm to the reasonable observer that the School District intended to endorse religion by continuing to display the Commandments.

On this point, the Third Circuit's decision in *Indian River*, 653 F.3d at 287, is particularly instructive. For years, the school district in that case opened its board meetings with a prayer, but it lacked a formal policy governing the practice. *Id.* at 261. In June 2004, a parent complained about the recitation of prayers at her daughter's graduation, so the school district, fearing a lawsuit over its prayer practices, decided to adopt a formal policy. *Id.* The vote on the policy was preceded by several board meetings attended by hundreds of members of the public, the majority of whom supported continuing the prayers and who viewed the complaint "as a move to stifle their religious freedom and to degrade the moral fiber of the community." *Id.* At one such meeting, which was preceded by a prayer vigil at the school, "attendees shouted 'Amen' or 'Praise Jesus' after scripture passages were quoted during the public comment period." *Id.* In addition, they held "signs reading 'Jesus is the Light of the Word' and 'Let us Pray, God is Listening.'" Finally, a state representative in attendance told the school board, "You have the public behind you . . . . If you do not do the right thing, the public will take you out, not the ACLU."

In striking down the policy under *Lemon*'s second prong, as modified by the endorsement analysis, the Court of Appeals found "[t]his history illuminating." *Id.* As the Court of Appeals explained:

> As exemplified by the August 24, 2004 meeting, there was clearly broad support among community members for the practice of prayer at the School Board meetings and District graduations. Not only did most of the attendees support the Board's practice, but their conduct reveals that in the minds of many, the issue of prayer at the Board meetings and graduations was closely intertwined with religion . . . The Policy was drafted in order to safeguard against a potential

lawsuit challenging the Board's unwritten practice of praying at every public meeting. The Policy was also drafted in an atmosphere of contention and hostility towards those who wanted prayers to be eliminated from school events. A reasonable person aware of this history would conclude that the primary effect of the Board's Policy was to endorse religion.

*Id.*

The circumstances in this case bear a striking resemblance to those in *Indian River*. Just as in *Indian River*, the Board's decision to maintain the monument was made amid a religiously tinged outpouring of public support. Taking note of that history, a reasonable observer would conclude that the primary effect of the School District's decision to continue displaying the monument was to endorse the religious views of those who rallied to support the monument.

In reaching that conclusion, the Court has not turned a blind eye to the passage of time and the age of the monument. Until this lawsuit, the monument apparently went largely unnoticed. As in *Freethought* and *Modrovich*, there is no evidence that the School District did anything to celebrate or highlight the monument during its 50-year existence. Indeed, some community members apparently thought the monument was a war memorial; some students apparently were not even aware of the existence of the monument; and Doe 5, herself, never raised an objection to the monument until 2012, despite having encountered it some years before either when her son started attending school at Junior High East or during her employment with the School District. So whatever the initial effect of the monument was, it may well have been diluted as the years have passed.

In the end, though, age is just one factor. Considering all of the circumstances, the Court cannot conclude that the endorsement effect has totally worn off over time. The monument still stands alone outside the school, declaring to all who pass it, "I AM the LORD thy God." There is no context plausibly suggesting that this plainly religious message has any broader, secular meaning – no other displays, no attempt to incorporate the Commandments into a study of the

law or government. Nothing else. Furthermore, while the import of the religious message may have receded somewhat over time, the public's reaction to the Board's initial decision to relocate the monument shows that it has never faded too far into the background. By siding with the majority and its decidedly religious motivations for wanting to keep the monument, the School District sent a message to the reasonable observer that people who disagree with the majority's religiously-inspired view are not necessarily welcome. Under the law, that is not permitted. "Whether the key word is 'endorsement,' 'favoritism,' or 'promotion,' the essential principle remains the same. The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'"[17] *Allegheny*, 492 U.S. at 593 (quoting *Lynch*, 465 U.S. at 687).

## IV.    Conclusion

Cases involving the Establishment Clause of the United States Constitution are not easy to decide or resolve. "[R]eligion has been closely identified with our history and government." *Schempp*, 374 U.S. at 212. Indeed, "we are a religious people whose institutions presuppose a Supreme Being[.]" *Id.* at 230 (Brennan, J., concurring). It is no wonder, then, that "deep feelings are aroused when aspects of that relationship are claimed to violate the injunction of the First Amendment that government may make 'no law respecting an establishment of religion, or prohibiting the free exercise thereof.'" *Id.* Courts are well equipped to make many types of decisions; balancing these competing concerns might not be one of them. Nevertheless, it is the task of this Court, as a Federal District Court, to faithfully apply the law enunciated by the Third

---

17.    Plaintiffs also argue that the third prong of *Lemon* has been established. The Court need not reach this issue, however, as it has found that the monument on public school grounds is not constitutional under the first two prongs of *Lemon*.

Circuit Court of Appeals and the United States Supreme Court, no matter whether this Court agrees with it or not. That law, no doubt, is not always clear. But in this case, it compels a finding that the Ten Commandments monument at the Connellsville Area School District Junior High School runs afoul of the Establishment Clause. This ruling is in no way meant to denigrate the sincerely held religious beliefs of the citizens and elected officials in the Connellsville community who rallied in support of keeping the monument. For this ruling in no way restricts "the ability of the community to acknowledge the religious commitment of its people." *Books*, 235 F.3d at 308. When, however, our government, at whatever level, departs from mere acknowledgement of our religious history to endorsement of a particular religious message, as set forth in the Ten Commandments, it has gone too far. Be that as it may, the Court is constrained by the mootness doctrine from granting Plaintiffs' requested injunctive relief and ordering the removal of the monument at this time.

Accordingly, the Motion for Summary Judgment filed by Plaintiffs will be **GRANTED**, and the Motion for Summary Judgment filed by the School District will be **DENIED**. Judgment will be entered in favor of Plaintiffs and nominal damages in the amount of $1.00 will be awarded. However, Plaintiffs' requests for injunctive and declaratory relief will be **DENIED AS MOOT**. An appropriate Order follows.

McVerry, S.J.

FREEDOM FROM RELIGION FOUNDATION,
INC., DOE 4, *by Doe 4's next friend and parent,*
DOE 5, *who also sues on Doe 5's own behalf,*

        Plaintiffs,

        vs.

CONNELLSVILLE AREA SCHOOL
DISTRICT,

        Defendant.

)
)
)
)
)   **2:12-cv-1406**
)
)
)
)
)
)
)
)
)
)

## ORDER OF COURT

AND NOW, this 28th day of August, 2015, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that the Motion for Summary Judgment filed by Plaintiffs (ECF No. 47) is **GRANTED,** and the Motion for Summary Judgment filed by the School District (ECF No. 37) is **DENIED**. A separate Judgment will follow.

                                  BY THE COURT:

                                  s/Terrence F. McVerry
                                  Senior United States District Judge

cc:    Marcus B. Schneider
        Email: mschneider@steeleschneider.com
        Alex J. Barker
        Email: alexbarker@steeleschneider.com

        John W. Smart
        Email: jsmart@andrewsandprice.com
        Amie A. Thompson
        Email: AThompson@andrewsandprice.com